**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

CASE NO. 12-cr-00033-JLK-1

UNITED STATES OF AMERICA,

        Plaintiff,

v.

**1.    JAMSHID MUHTOROV,**

        Defendant.

_____

**DEFENDANT'S SUPPLEMENTAL AUTHORITY IN SUPPORT
OF HIS REPLY TO GOVERNMENT'S RESPONSE**
_____

      Jamshid Muhtorov submits this supplemental filing to bring to the Court's attention two recent articles from the Washington Post that bear directly upon the issues before it.[1] The articles are based upon the Post's review of "roughly 160,000 intercepted e-mail and instant-message conversations," *Post I*, Attachment A, that were acquired under the FISA Amendments Act ("FAA"). According to the Post, the communications were acquired by the government

---

[1] Barton Gellman, Julie Tate, & Ashkan Soltani, *In NSA-Intercepted Data, Those Not Targeted Far Outnumber the Foreigners Who Are*, Wash. Post, July 5, 2014, http://wapo.st/1xyyGZF (hereinafter "*Post I*"); Barton Gellman, *How 160,000 Intercepted Communications Led to Our Latest NSA Story*, Wash. Post, July 11, 2014, http://wapo.st/VU5SNq (hereinafter "*Post II*", Attachment B).

1

between 2009 and 2012, roughly the same time period during which the government monitored Mr. Muhtorov's communications under the FAA.

The articles offer the best public evidence available of how the government implements the FAA's targeting and minimization procedures and of the scope of "incidental" collection of U.S. persons' communications under the FAA.[2] For three reasons they directly support Mr. Muhtorov's challenges to constitutionality of the FAA and to his request for discovery and for a *Franks* hearing.

**First, the articles undermine the NSA's claim that its targeting procedures are reasonably designed to limit FAA surveillance to foreigners abroad.**

According to the Post, "[t]he rationales [the NSA] use[s] to judge foreignness sometimes stretch legal rules or well-known technical facts to the breaking point." *Post I,* Attachment A.  The NSA has "designated as its target the Internet protocol, or IP, address of a computer server used by hundreds of people," *id.,* all but guaranteeing the surveillance of U.S. persons. Similarly, the Post "found many cases in which analysts based a 'reasonable belief of foreignness' on the fact that the target was speaking a foreign language or

---

[2] *See Post I,* Attachment A ("No government oversight body, including the Justice Department, the Foreign Intelligence Surveillance Court, intelligence committees in Congress or the president's Privacy and Civil Liberties Oversight Board, has delved into a comparably large sample of what the NSA actually collects—not only from its targets but also from people who may cross a target's path.").

2

logging on from an IP address that appeared to be overseas." *Post II*, Attachment B.  These criteria "would apply to tens of millions of Americans." *Id.*; *see also Post I,* Attachment A ("One analyst rests her claim that a target is foreign on the fact that his e-mails are written in a foreign language, a quality shared by tens of millions of Americans. Others may presume that anyone on the chat 'buddy list' of a known foreign national is also foreign."); *id.* ("In many other cases, analysts seek and obtain approval to treat an account as 'foreign' if someone connects to it from a computer address that seems to be overseas.").

These facts contradict key claims made by the government. In arguing that the FAA is reasonable under the Fourth Amendment, *see* Doc. 559, pp. 52 et seq., that the government's targeting procedures comply with the FAA, *id.* pp. 83 et seq., and that neither discovery nor a *Franks* hearing is warranted, *id.* pp. 91–94, 96, the government asserts that the targeting procedures it uses are reasonably designed to protect U.S. persons from becoming targets of NSA surveillance. This cannot be squared with the revelation that the NSA bases its targeting decisions on criteria that apply to *tens of millions* of Americans. The Post's articles suggest that the NSA may have misled the FISC or this Court about how its targeting procedures function.

**Second, the articles confirm that the NSA does not purge incidentally acquired information of U.S. persons.**[3]

Rather, "the agency's policy is to hold on to 'incidentally' collected U.S. content, even if it does not appear to contain foreign intelligence." *Post I*, Attachment A. "The NSA does not discard [incidentally collected] U.S. conversations." *Post II*, Attachment B. Instead, "[i]t stores them, with names uncensored, in a repository called PINWALE and other central databases." *Id*. Once it stores the conversations of U.S. persons in its databases, the NSA searches them without a warrant. *Id.* "The CIA does so as well, and the FBI reported recently that it searches the data so routinely that it cannot provide a count [of how often it does so]." *Id.*

These revelations contradict other claims at the core of the government's arguments. Virtually every one of these — relating to reasonableness under the Fourth Amendment, Doc. 559, 64–71, to the government's asserted good faith in implementing the FAA, *id*. 80–81, to the compliance of the government's minimization procedures with the FAA's requirements, id. 83–85, and to Mr.

---

[3] The Privacy and Civil Liberties Oversight Board reached the same conclusion. *See* PCLOB, *Report on the Telephone Records Program Conducted under Section 215 of the USA PATRIOT Act and on the Operations of the Foreign Intelligence Surveillance Court* 62 (Jan. 23, 2014), http://www.pclob.gov/All%20Documents/Report%20on%20the%20Telephone%20Records%20Program/PCLOB-Report-on-the-Telephone-Records-Program.pdf ("Thus, in practice, this requirement rarely results in actual purging of data.")

Muhtorov's requests for discovery, *id.* 92, and for a *Franks* hearing, *id.* 96 — relies upon the supposed strength of the government's minimization procedures or the candor with which it has defended them before the FISC.

Based on the recent revelations, it appears the government is not — as required — minimizing its retention of communications to, from, or about U.S. persons, like Mr. Muhtorov. Instead, the government artfully words its minimization procedures — or disingenuously applies them — to permit the assembling of enormous databases of communications by "incidentally" overheard U.S. persons. It then searches those databases for information about specific U.S. persons — all without a warrant.

**Finally, the articles quantify the extraordinary scale of supposedly "incidental" collection.**

The Post's review of 160,000 intercepted communications reveals that "[n]ine of 10 account holders found in [the] cache of intercepted conversations . . . were not the intended surveillance targets but were caught in a net the agency had cast for somebody else." *Post I*. Attachment A. More importantly, for Fourth Amendment purposes, the Post's review revealed that "[n]early *half* of the surveillance files . . . contained names, e-mail addresses or other details that the NSA marked as belonging to U.S. citizens or residents." *Id.* These estimates are likely low given that the cache of communications reviewed by the Post had

already been "minimized by hand after automated efforts." *Post II*; *see id.* ("Had it not been minimized, we would have found far more Americans than we identified on our own.").

The surveillance that the government claims only "incidentally" affects U.S. persons involves a U.S. person fifty percent of the time — if not more. This not only dramatically affects the Fourth Amendment analysis of the surveillance of Mr. Muhtorov, but it exposes the government's previous refusals to even estimate the number of U.S. persons affected by FAA surveillance as indefensible evasions. *See, e.g.*, Letter from Office of the Director of National Intelligence to Sens. Ron Wyden & Mark Udall 2 (July 26, 2011), http://1.usa.gov/WknQcw ("[I]t is not reasonably possible to identify the number of people located in the United States whose communications may have been reviewed under the authority of the FAA . . . ."). It highlights the stakes of permitting the government to monitor essentially *every* Americans' *every* international call or email.  The government will use that authority to the point of abusing it. The government will ensnare many U.S. persons in the process. The government will store the communications it collects in enormous databases. The government will search those databases routinely and without a warrant.

\*     \*     \*

The Post's revelations reinforce Mr. Muhtorov's claims that the government's surveillance of his communications violated the FAA and the Constitution and his motion to suppress the fruits of this surveillance as evidence against him. More broadly, they call into question the accuracy and completeness of the government's descriptions of surveillance under the FAA and the extent to which it may have concealed information about the operation of the statute and its application to Mr. Muhtorov. In this latter respect, the revelations provide additional support for a meaningful opportunity to challenge that surveillance through discovery and a *Franks* hearing.

Dated: July 22, 2014        Respectfully submitted,

                            VIRGINIA L. GRADY
                            Federal Public Defender

                            /s/ Warren R. Williamson
                            WARREN R. WILLIAMSON
                            Assistant Federal Public Defender
                            633 Seventeenth Street, Suite 1000
                            Denver, Colorado 80202
                            Telephone: (303) 294-7002
                            Fax: (303) 294-1192
                            Rick_Williamson@fd.org

                            /s/Brian Rowland Leedy
                            Brian Rowland Leedy
                            Assistant Federal Public Defender
                            633 Seventeenth Street, Suite 1000
                            Denver, CO 80202
                            Telephone:  303-294-7002
                            Fax:  303-294-1192
                            Brian_Leedy@fd.org

/s/ Kathryn J. Stimson
Kathryn J. Stimson,
Attorney at Law
1544 Race Street
Denver, CO 80206
Telephone: (720) 638-1487
kathryn@stimsondefense.com

Attorneys for Jamshid Muhtorov

*On the brief*:

Jameel Jaffer
Alex Abdo
Patrick Toomey
Brett Max Kaufman
Nathan Freed Wessler
Attorneys at Law
American Civil Liberties Union Foundation
125 Broad St., 18th Floor
New York, NY 10004
Telephone: (212) 519-7816
Fax: (212) 549-2654
jjaffer@aclu.org

Mark Silverstein
Sara J. Rich
Attorneys at Law
ACLU Foundation of Colorado
303 E. 17th Avenue, Suite 350
Denver, Colorado 80203
Phone: (303) 777-5482;
Fax: (303) 777-1773
msilverstein@aclu-co.org

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2014, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email address:

Gregory A. Holloway
Assistant U.S. Attorney
Email: gregory.holloway@usdoj.gov

Erin Martha Creegan
National Security Division for the U.S. Dept. of Justice
Email: erin.creegan@usdoj.gov

David B. Savitz, Esq., Counsel for Bakhtiyor Jumaev
Email: savmaster@aol.com

Mitchell Baker, Esq., Counsel for Bakhtiyor Jumaev
Email: mitchbaker@estreet.com

I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Mr. Jamshid Muhtorov     *(Via U.S. Mail)*

/s/ Warren R. Williamson
WARREN R. WILLIAMSON
Assistant Federal Public Defender
633 Seventeenth Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 294-7002
Fax: (303) 294-1192
Rick.Williamson@fd.org

Attorney for Defendant