IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 12-cr-00033-JLK

UNITED STATES OF AMERICA,

       Plaintiff,

v.

JAMSHID MUHTOROV,

       Defendant.

___

**DEFENDANT'S MEMORANDUM REGARDING SENTENCING GUIDELINES
AND ADOPTION OF ARGUMENTS MADE BY BAKHTIYOR JUMAEV
IN DOCS. 1908 AND 1910**
___

      On July 2, 2018, the Court filed a Notice of Rejection of U.S. Sentencing Guidelines. Doc. 1914.[1] It advised the Court would not be following the Guidelines in the sentencings of Mr. Muhtorov and Mr. Jumaev, as they are "inadequate and illogical when applied to the facts of these Defendants."[2]

      Mr. Muhtorov agrees the sentencing guidelines applied in material support cases, and particularly as "adjusted" under § 3A1.4, suggest – in an advisory way – prison sentences that bear no relationship to the sentencing factors outlined in 18 U.S.C.A § 3553(a). [3]

---

[1] "Doc." meaning clerk's docket.

[2] In its Sentencing Statement in Mr. Jumaev's case, the government applies 3A1.4 to come up with a guideline range of 360 years to life. Doc. 1883 page 13.

[3] "Of all the adjustments in the Guidelines, the Terrorism Enhancement is the most severe." *See Illusion of Justice: Human Rights Abuses in US Terrorism Prosecutions*, Colum. L. Sch. Hum. Rts. Inst. & Hum. Rts. Watch 124 (July 21, 2014). With this adjustment, the Guidelines calculate prison sentences at offense levels in the 30's and an automatic Criminal History Category of VI, often higher than the statutory maximums for the offenses of conviction, themselves. "[T]he Enhancement can lead to a sentence from thirty years to life for a crime that would otherwise result in a sentence of around five years." Sameer Ahmed, Is History

Recognizing that the Court will elaborate on its Notice of Rejection in upcoming orders, Mr. Muhtorov files this memorandum in support of the Court's authority to not follow the U.S. Sentencing Guidelines, and, in particular § 3A1.4. He begins with three quotes, and one caution:

The quotes:

1. "[C]ourts are not machine presses and sentences are not widgets to be churned out on some criminal justice conveyor belt." *United States v. Sabillon-Umana*, 772 F.3d 1328, 1330 (10th Cir. 2014) (Gorsuch, J.)[4]

2. "[A district court's] categorical disagreement with and variance from the Guidelines is not suspect." *Spears v. United States*, 555 U.S. 261, 264, 129 S. Ct. 840, 843, 172 L. Ed. 2d 596 (2009).

3. Courts of appeal "uphold even substantial variances when the district court properly weighs the § 3553(a) factors and offers valid reasons for the chosen sentence." *United States v. Barnes*, 890 F.3d 910, 916 (10th Cir. 2018).

The caution:

4. "[T]he sentencing process [in terrorism cases] will continue to witness the phenomenon of federal appellate judges substituting their judgment for that of the district court . . . if they feel the penalty is too lenient, based on assumptions about the nature of a terrorist." Wadie E. Said, Sentencing Terrorist Crimes, 75 Ohio St. L.J. 477, 527 (2014).[5]

---

Repeating Itself? Sentencing Young American Muslims in the War on Terror, 126 Yale L.J. 1520, 1528 (2017)

[4] On conveyer belts, see https://www.youtube.com/watch?v=HnbNcQlzV-4.

[5] A particularly offensive example is found in *United States v. Jayyousi*, 657 F.3d 1085 (11th Cir. 2011) (but note the dissent). Compare *United States v. Thavaraja*, 740 F.3d 253, 263 (2d

**Preliminary matters**

1. **Motion to adopt , approve, incorporate, etc., the reasons stated and arguments advanced by Mr. Jumaev**

Under D.C.COLO.LCrR 12.1, Mr. Muhtorov approves, adopts, etc. the arguments advanced and authorities cited as they relate to the Sentencing Guidelines in codefendant Bakhtiyor Jumaev's Sentencing Statement and Motion for Variant Sentence, Doc. 1908, filed June 28, 2018.[6]

2. **The Sentencing Guidelines for the offenses of conviction must be correctly calculated**

Regardless of a particular Guideline's illogic, inadequacy, incompatibility with § 3553(a), or other flaws, district courts are "procedurally obligated to calculate and consider the Sentencing Guidelines in reaching an independent decision as to sentence." *United States v. Awan*, 607 F.3d 306, 312 (2d Cir. 2010). *See also Gall v. United States*, 552 U.S. 38, 49-50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007; *United States v. Rosales-Miranda*, 755 F.3d 1253, 1259 (10th Cir. 2014) ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."); 18 U.S.C. § 3553(a)(4).  This includes considering any departures that would support a sentence outside the guideline range.[7]

---

  Cir. 2014), upholding a variant sentence in a "terrorism" case, with this language: "[W]e conclude that the sentence imposed in this case reflects thoughtful and principled consideration by a conscientious district judge of all the factors relevant to an individualized determination of a fair and just sentence."

[6] He does not adopt the arguments Mr. Jumaev makes about his role in the offense under U.S.S.G. § 3B1.2. *See* Doc. 1908, p. 22.

[7] In deciding whether to impose a sentence outside the advisory guidelines range, a court should first consider "whether a departure is appropriate based on the Guidelines Manual or relevant case law". [*United States v. Moreland*, 437 F.3d 424, 432 (4th Cir.2006).] "'If an appropriate basis for departure exists, the district court may depart.' *Id*. If the resulting range still does not serve the factors set forth in § 3553(a), the court may impose a non-guidelines sentence, also known as a variance sentence, but must articulate the reasons for the sentence imposed."

The correct calculation of a guidelines range does not prevent a sentencing court from disagreeing with it on policy grounds. *See e.g., United States v. Garcia-Jaquez*, 807 F. Supp. 2d 1005, 1007-8 (D. Colo. 2011) (recognizing the starting point in sentencing is to calculate the guideline range, but that courts "may also categorically vary from the guidelines based on a policy disagreement with a particular guideline.")

### Summary of Argument

This Court has the authority, or discretion, to discount (but not discard) a sentencing guideline imprisonment range to reflect policy disagreements with it.

The problems with Guideline § 3A1.4 are many. It was implemented in haste with no empirical data to support its draconian impact. It is inconsistent with 18 U.S.C. § 3553(a) and the mandate that each sentence account for "the nature and circumstances of the offense and the history and characteristics of the defendant." Part of this failure comes from its automatic imposition of a Criminal History Category of VI, regardless of an offender's actual criminal history. It deviates without explanation from the statutory penalties for the offenses to which it relates and unlike the statutes themselves, § 3A1.4 makes no allowance for – or distinction between – the manner in which these offenses may be committed.

### Section 3A1.4 was implemented by congressional directive, and there is no empirical data to support it.

### There is no empirical basis for § 3A1.4

"The extent to which a sentencing court should accord respect to a guideline will generally depend on whether, when it developed the guideline, the Commission functioned as Congress envisioned in the Sentencing Reform Act." Lynn Adelman & Jon Deitrich, Improving

---

*United States v. Benkahla*, 501 F. Supp. 2d 748, 758 (E.D. Va. 2007), *aff'd*, 530 F.3d 300 (4th Cir. 2008).

4

the Guidelines Through Critical Evaluation: An Important New Role for District Courts, 57 Drake L.Rev. 575 (2009).[8]  *See United States v. Grober*, 624 F.3d 592, 608 (3d Cir. 2010) ("[A] Guideline is likely to reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives only when it is the product of empirical data and national experience, guided by a professional staff with appropriate expertise).

The Commission did not consider data or national experience when it promulgated Guideline § 3A1.4.  As was the case with the knee-jerk "War on Drugs" crack guidelines, there was no empirical approach that resulted in Guideline § 3A1.4.  "[W]hen U.S.S.G. section 3A1.4 was adopted, the number of the anti-terrorism cases was tiny, and so there could be no analysis of a statistically reliable group of defendants upon which to build a reliable Guideline." James P. McLoughlin, Jr., Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations, 28 Law & Ineq. 51, 112 (2010).

> **Section 3A1.4 is not the product the Sentencing Commission's exercise of its characteristic institutional role and the district court may disagree with or discount it.**

In *Kimbrough v. United States,* 128 U.S. 558, 5623 (2007), the Supreme Court held that a district court did not abuse its discretion by refusing to apply the 100-to-1 crack cocaine to powder cocaine ratio of USSG § 2D1.1 where the court found that applying the ratio would yield "a sentence 'greater than necessary' to achieve § 3553(a)'s purposes."  The Court reasoned that the crack cocaine guidelines were entitled to less deference because, in formulating the guidelines, the Sentencing Commission had not acted in the "exercise of its characteristic

---

[8] *See Rita v. United States*, 551 U.S. 338, 349 (2007) (outlining the "empirical approach" that the Sentencing Commission used to structure the Sentencing Guidelines)

institutional role" to formulate guidelines in light of "empirical data and national experience," but had instead quickly adopted congressional language mandating the 100-to-1 ratio. *See also Spears v United States*, 555 U.S. 261, 264 (2009) ("[E]ven when a particular defendant [in a crack cocaine case] presents no special mitigating circumstances—no outstanding service to country or community, no unusually disadvantaged childhood, no overstated criminal history score, no post-offense rehabilitation—a sentencing court may nonetheless vary downward from the advisory guideline range" based on a "policy disagreement with them.")

These decisions (to vary from a guideline range) are supported, or "not suspect," when a court "appropriately frame[s] its final determination in line with § 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing." *Id*. at 265.

While Congress has the ultimate authority over the Guidelines "and may enact directives to the Commission which the Commission is obliged to implement . . . *Kimbrough* permits district courts to vary 'even where a guideline provision is a direct reflection of a congressional directive.'" *United States v. Grober, supra*, 608–09(quoting United *States v. Arrelucea-Zamudio*, 581 F.3d 142, 150 (3d Cir. 2009)). *See also United States v. Rosales-Miranda*, supra at 1264 (recognizing in *dictum* a sentencing court's discretion "not to discard the Guidelines range, but rather to discount it to reflect the court's policy disagreements.")

At least one circuit has addressed this in the context of Guideline § 3A1.4 which was, like the crack guidelines, promulgated by congressional directive, not after empirical research. As a consequence, district courts may, based on policy disagreements, vary from the sentencing range suggested by the guideline. *United States v. Mason*, 410 Fed. Appx. 881, 886 (6th Cir. 2010)

(recognizing the district court "understood its authority to disagree with the terrorism adjustment.")

### Section 3A1.4 is inconsistent with 18 U.S.C. § 3553(a) and its mandate that each sentence account for "the nature and circumstances of the offense and the history and characteristics of the defendant."

"Post-*Booker*, federal courts are instructed to fashion a sentence based on a variety of statutory factors under 18 U.S.C. § 3553(a), including 'the nature and circumstances of the offense and the history and characteristics of the defendant.' However, unlike with other crimes, sentencing in the terrorism context--and the Terrorism Enhancement especially--fails to address these factors. The Terrorism Enhancement treats all offenders the same, without taking into account their actual conduct or individual background, such as age and criminal history. Thus, the Enhancement undermines a basic principle of U.S. sentencing law and its underlying commitment to retributive justice: that punishment should be proportional to the crime." Sameer Ahmed, Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror, 126 Yale L.J. 1520, 1524, 1528-9 (2017).

Courts may no longer presume a guideline range is reasonable but must make an individual assessment of the § 3553(a) factors based on all facts presented. *Gall v. United States*, 552 U.S. 38, 51 (2007).[9] This involves considering the nature of the offense and the

---

[9] 18 U.S.C. § 3553(a):
The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.
The court, in determining the particular sentence to be imposed, shall consider—
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and

characteristics of the offender. The characteristics include a person's criminal record, if any. Also, courts are to evaluate "the seriousness of the offense" under § 3553(a)(2)(A).

Section 3A1.4, adopted at the direction of Congress, not only ignores the dictates of § 3553(a), it ignores the normal process by which the sentencing guidelines are calculated under U.S.S.G. § 1B1.1. (Application Instructions). "The terrorism enhancement takes a wrecking ball to this carefully constructed edifice." George D. Brown, Punishing Terrorists: Congress, the Sentencing Commission, the Guidelines, and the Courts, 23 Cornell J.L. & Pub. Pol'y 517, 520 (2014).

### **Section 3A1.4 deviates from the statutory penalties for the offenses to which it relates and, unlike the statutes themselves, makes no allowance for – or distinction between – the manner in which these offenses were committed.**

Federal terrorism statutes make distinctions in penalties depending on such things as motive or actual harm caused. Section 3A1.4 is distinction free.

"When section 3A1.4 is applied [to sentencing] the distinction between the sentences for violent and non-violent crimes can narrow, exposing a fundamental inconsistency between the penalties Congress has promulgated and the actual sentencing levels terrorism defendants are exposed to, regardless of violent conduct." Wadie E. Said, Sentencing Terrorist Crimes, 75 Ohio St. L.J. 477, 501 (2014).

---

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established [and recommended by the Sentencing Guidelines];
(5) any pertinent policy statement ... issued by the Sentencing Commission ...; ...
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

Christina Parajon Skinner, in a 2013 article in the Yale Law and Policy Review,

*Punishing Crimes of Terror in Article III Courts*, put it this way:

> As applied to War on Terror cases, the Sentencing Guidelines also seem in tension with U.S. statutory law. In particular, the operation of the Terrorism Enhancement [3A1.4] is inconsistent with the statutes that criminalize terroristic acts. One source of that inconsistency is the irrelevancy to the Terrorism Enhancement of a defendant's motivation for committing the offense, while the statutes themselves often distinguish between violent and financial crimes.[10]
>
> . . .
>
> Based on the penalties delimited by the statutes themselves, it seems clear that "Congress did not intend to punish a financial supporter of a[n] FTO or organization that commits a terrorist act as severely as an individual who commits the act itself." As others have observed, by "[c]harting these and other anti-terrorism statutes, it appears that *the penalties are meant to be proportional to the culpability of the conduct, to the injury that can be directly attributed to a defendant's actions,* and to the nature of the organization's actions." In view of the statutory scheme that seems to treat separately financial and ideological terrorism, it is troubling that the Terrorism Enhancement provides no explicit gradation where motives are concerned. [11]

31 Yale L. & Pol'y Rev. 309, 342-44. (emphasis supplied, footnotes omitted).[12]

---

[10] "The material support statutes . . . distinguish between violent and financial conduct. Section 2339A initially set the maximum penalty at ten years, and was amended by the PATRIOT Act to allow a maximum of fifteen years, or life imprisonment if a death results. Section 2339B allows for a maximum sentence of fifteen years, or life imprisonment if a death results. Section 2339C, which was enacted as part of the Anti-Terrorism Convention of 2002, punishes the provision of funds when one knows or intends that they will be used for terrorism. Section 2339C distinguishes between defendants who know or intend that the funds will be so used, and those who do not act knowingly. If the government proves that the defendant acted with the intent that the funds be used--or with knowledge that funds will be used--to fund a specific act of terrorism, the maximum penalty is twenty years." Christina Parajon Skinner, *Punishing Crimes of Terror in Article III Courts* 31 Yale L. & Pol'y Rev. 309, 342-44.

[11] "As pointed out in the National Journal, 'Critics of the terrorism enhancement have seized on this issue of congressional intent to argue that the courts have veered into forbidden territory.'" Shane Harris, The Terrorism Enhancement: An Obscure Law Stretches the Definition of Terrorism, and Metes Out Severe Punishments, Nat'l J., July 13, 2007, *http://shaneharris.com/magazinestories/terrorism-enhancement-obscure-law-stretches-thedefinition-of-terrorism-and-metes-out-severe-punishments*.

[12] George D. Brown, *Notes on a Terrorism Trial--Preventive Prosecution, "Material Support" and the Role of the Judge After United States v. Mehanna,* 4 Harv. Nat'l Security J. 1, 54 (2012) ("[The Terrorism Enhancement does not reflect] an important value of the criminal law:

**Repeating the errors of the past**

"[J]ust like the War on Drugs, the government's sentencing policies--in particular the Sentencing Guidelines' Terrorism Enhancement--fail to take into account the differences between a violent terrorist who has killed dozens and an American Muslim . . . who tweets support for ISIS online. . . .[T]he lessons learned from counterproductive War on Drugs sentencing laws have not yet been translated to the War on Terror. . . And, like the War on Drugs, the War on Terror policies have failed to serve the purposes of criminal sentencing or to contribute to an effective counterterrorism policy."

Sameer Ahmed, Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror, 126 Yale L.J. 1520, 1524, 1528-9 (2017).

**Section 3A1.4 artificially manipulates a defendant's Criminal History Category**.

As with the offense level, there was no empirical data considered by the Commission supporting the automatic jump to Criminal History Category VI that accompanies § 3A1.4. Where, as is true with Mr. Muhtorov, a defendant has no criminal record, the impact on the guideline imprisonment range from this leap is dramatic. [13]

This puts § 3A1.4 at odds with 18 U.S.C. § 3553(a) (1) which requires a court to consider a defendant's history and characteristics in making its sentencing determinations. "History and

---

the gradation of offenses. We do not treat a purse-snatcher like a rapist. The Enhancement reflects a different view: a terrorist is a terrorist.")

[13] U.S. Sentencing Guidelines Manual § 3A1.4(b) (a defendant sentenced under the Guideline is to automatically receive an enhanced Criminal History Category, without mandating individualized consideration of whether this is appropriate for the individual defendant). This is at variance with the Commission's thoughts in formulating the Guidelines: *Cf.* 28 U.S.C. § 994(j) ("The Commission shall insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense . . .")

characteristics" include a defendant's criminal record. Lack of a criminal record or first offender status, is a significant factor in calculating Guideline sentences.[14] By creating an artificial category of VI, even for first offenders, § 3A1.4 ignores that those who typically end up in that (highest) category, by virtue of their criminal records, have significantly worse personal histories.

No empirical data supported this automatic increase, one effect of which "is to exacerbate disparities between the sentences of similar defendants for similar conduct, because this Guideline instructs a sentencing court to substitute an artificial determination for each individual defendant's true characteristics." *McLoughlin*, supra at 111.

**Departing downward to compensate for § 3A1.4's criminal history impact**.

While this memo focuses on the Court's authority to disagree with the § 3A1.4 Guideline, courts may also depart downward from the guideline including, under U.S.S.G. § 4A1.3, from its automatic Criminal History Category of VI. While some courts of appeal have found "the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under [U.S.S.G.] § 3A1.4 (b)" [*United States v. Meskini*, 319 F.3d 88, 92 (2d Cir.), *cert. denied*, 538 U.S. 1068, 123 S.Ct. 2240, 155 L.Ed.2d 1125 (2003)], . . . . in the same virtual breath, [they have] said, '[a] judge determining that § 3A1.4 (b) over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other

---

[14] *See* United States Sentencing Commission, Recidivism and the "First Offender" (May 2004): "From both culpability and recidivism risk perspectives, offenders [ ] with no prior arrests, most strongly meet the conceptual definition of the first offender category. [These] [o]fenders have had no recorded contact with the criminal justice system prior to their instant federal offense. Moreover, as indicated by their extremely low recidivism rate of 6.8 percent, they are easily the most empirically identifiable group of guideline federal offenders who are the least likely to re-offend." *United States v. Wyrick*, 416 Fed. Appx. 786, 793 (10th Cir. 2011).

11

crimes' always has the discretion under § 4A1.3 to depart downward in sentencing. U.S.S.G. § 4A1.3.'"[15] *Id*. *See also United States v. Stewart*, 590 F.3d 93, 143–44 (2d Cir. 2009). (Despite the application of § 3A1.4 to increase the Criminal History Category to VI, courts retain discretion to depart downward under § 4A1.3 (overrepresentation of criminal history)); *United States v. Benkahla,* 501 F. Supp. 2d 748, 759 (E.D. Va. 2007), *aff'd*, 530 F.3d 300 (4th Cir. 2008) (Despite § 3A1.4's provision of a uniform criminal history category, a court may still vary from that category based upon the concerns in § 4A1.3.)

**Conclusion**

District courts have the discretionary authority not to apply a guideline based on policy disagreements with it. As part of the sentencing process the guideline range must be calculated, but in the final analysis any sentence imposed must comply with the purposes articulated in 18 U.S.C. § 3553(a), and be sufficient, but not greater than necessary, to comply with those purposes.

---

[15] U.S.S.G. 4A1.3 (b) Downward Departures.--
(1) Standard for Downward Departure.--If reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted.
. . .

(c) Written Specification of Basis for Departure.--In departing from the otherwise applicable criminal history category under this policy statement, the court shall specify in writing the following:
. . .

2) In the case of a downward departure, the specific reasons why the applicable criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes.

While the post-*Booker* guidelines have some continuing gravitational pull on the sentencing process, as Justice (then circuit judge) Gorsuch observed in the same opinion from which the "widget" quote was taken:

> Sentencing someone to prison has to be one of the district judge's toughest tasks. So much is at stake for the defendant, the victim, and the community. So much responsibility rests on the judge's shoulders, along with the high expectation that the judge will wisely weigh things that cannot be easily weighed. How much punishment is enough to protect the public? To deter future wrongdoing? To reflect the gravity of the offense? And how much punishment suffices to accomplish all these things without verging on cold revenge or needless retribution? There's rarely a single right answer to hard questions like these. So our system depends, as perhaps it must, on the discretion of thoughtful judges.

*United States v. Sabillon-Umana,* supra at 1330.

Guideline § 3A1.4 attempts to suppress the meaningful exercise of judicial discretion, and relegates sentencing in so called terrorism cases to the conveyer belt and widget process that Justice Gorsuch criticized. It does so despite being a creature of politics, rather than the product of the traditional process by which guidelines are promulgated. To the extent it is entitled to any deference in the post-*Booker* world, it is entitled to less as a consequence.

The guideline's suggested approach, including the automatic increase of a defendant's criminal history category to VI, is at odds with 18 U.S.C. § 3553 and the statute's mandate that no sentence be "greater than necessary" to achieve the goals of sentencing.

As exemplified in the government's sentencing position in Mr. Jumaev's case, adherence to the "Terrorism Enhancement," as it is sometimes called, can give rise to *de facto* mandatory minimum sentences. This is because the Guideline's sentencing range, as it does for Mr. Jumaev, often exceeds the statutory maximum for the offense of conviction, effectively making the statute's maximum the minimum sentence. All of which is to say the Terrorism Enhancement attempts to force outcomes that bear no relationship to what the sentencing process is supposed to be about.

As the Supreme Court said in *Rita*, "The sentencing judge has access to, and greater familiarity with, the individual case and the individual defendant before him than the Commission or the appeals court." 551 U.S. 357-58.[16] This is another way of saying district courts are in the best position, after "thoughtful and principled consideration . . . of all the factors relevant to an individualized determination of a fair and just sentence" [*United States v. Thavaraja*, *supra* at 263 ], to decide what that sentence should be.

As James P. McLoughlin, said in his piece about deconstructing Guideline § 3A1.4:

> Nuance in sentencing those guilty of "material support" is better anti-terrorism policy, as well as better sentencing policy. U.S.S.G. section 3A1.4, in its deviation from existing Guidelines policy and failure to account for the specific attributes of each offense and defendant, represents the worst in U.S. sentencing policy, and as such should be abandoned.

*McLoughlin*, *supra*, at 112.

While *abandonment* of the § 3A1.4 guideline may not be an option (the guidelines must still be calculated as part of sentencing), disagreement with it is.

    Respectfully submitted,

    VIRGINIA L. GRADY
    Federal Public Defender


    /s/ Warren R. Williamson
    WARREN R. WILLIAMSON
    Assistant Federal Public Defender
    633 17th Street, Suite 1000
    Denver, CO  80202
    Telephone:  (303) 294-7002
    FAX:  (303) 294-1192
    Email: rick.williamson@fd.org
    Attorney for Defendant

---

[16] Especially true in the Muhtorov and Jumaev cases with which the Court has six plus years of experience, including two jury trials.

## CERTIFICATE OF SERVICE

I hereby certify that on July 13, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

**Gregory Allen Holloway**
Email:  Gregory.Holloway@usdoj.gov

**David Alan Tonini**
Email:  David.Tonini@usdoj.gov

**Beth Gibson**
Email:  Beth.Gibson@usdoj.gov

**Julia K. Martinez**
Email:  Julia.Martinez@usdoj.gov

**Kathryn J. Stimson**
Email: kstimson@hmflaw.com

**Brian Rowland Leedy**
Email: bleedy@hmflaw.com

**Patrick C. Toomey**
Email: ptoomey@aclu.org

**Jacob R. Rasch-Chabot**
Email: Jacob_Rasch-Chabot@fd.org

**David Barry Savitz**
Email: savmaster@aol.com

**Mitchell Baker**
Email: mitchbaker@estreet.com

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

    Jamshid Muhtorov
    via mail:

                          /s/ Warren R. Williamson
                          WARREN R. WILLIAMSON
                          Assistant Federal Public Defender
                          633 17th Street, Suite 1000
                          Denver, CO  80202
                          Telephone:  (303) 294-7002
                          FAX:  (303) 294-1192
                          Email: rick.williamson@fd.org
                          Attorney for Defendant