IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 12-cr-00033-JLK-1

UNITED STATES OF AMERICA,

               Plaintiff,

v.

JAMSHID MUHTOROV,

               Defendant.

_____

## DEFENDANT'S SENTENCING STATEMENT

_____

      Jamshid Muhtorov files this sentencing statement to support his request that the Court impose a sentence of time served (6 years 7 months, 9 days, or 79 months) and to respond to the government's Sentencing Statement, Doc.1927, filed July 23, 2018. [1]

      79 months in prison is a sentence sufficient, but not greater than necessary, to comply with the purposes in 18 U.S.C.A. § 3553 (a) (2). More important, it is a sentence based on rational thought, humanity and compassion.

_____

[1] "Doc." means the clerk's docket.

## SUMMARY

Jamshid Muhtorov, a 42-year-old political refugee from Uzbekistan, father of three, husband of Nargiza Muhtorova, faces sentencing after his convictions on three of four counts that charged attempting and conspiring to provide material support to the Islamic Jihad Union or I.J.U. The material support was $300.00 and himself (as personnel).

When arrested in January of 2012 at Chicago's O'Hare Airport, Mr. Muhtorov had no criminal record, although he was a wanted man in his home country.

The circumstances that made him such were those that also made him eligible for refugee status: He spoke out about human rights abuses in Uzbekistan, one of the world's most repressive and brutal regimes. A regime that crushed free thought, free speech, and free expression of religion, that tortured its citizens in unspeakably cruel ways, that slaughtered hundreds during a peaceful demonstration in the city of Andijan in May of 2005.

Mr. Muhtorov spoke truth to power. Despite the risks. Danish documentary filmmaker Michael Andersen called him "one of the more prominent and reputable human rights defenders in the country."

When Mr. Muhtorov spoke out about the Andijan massacre, he was warned, then threatened, then beaten by the secret police. The last assault was in November 2005, when he was left lying in a road, unconscious. Shortly after, warned by other activists he was being hunted by the SNB, the notorious Uzbek secret police, he, his wife and two children fled Uzbekistan for Kyrgyzstan.

After vetting by the UNHCR, the State Department, DHS, and ICE, Mr. Muhtorov and his family were admitted as refugees to the United States in 2007. In America, Mr. Muhtorov could, he thought, say what he wanted, read what he wanted, watch what he wanted, and

worship as he wanted.  One focus, even obsession, was the plight of his fellow Uzbeks.  Brutal human rights abuses continued unabated in Uzbekistan while the West turned a blind eye.  The routes through (and one airbase in) the country were vital to the ongoing coalition war in Afghanistan.

Mr. Muhtorov favored efforts to free his country from the iron grip of Islam Karimov, its brutal dictator.  This brought him in contact – by email, mainly – with the Islamic Jihad Union, or I.J.U., a splinter group formed in 2001 or 2002 dedicated to liberating Uzbekistan.  The I.J.U.'s membership had, by 2009, dwindled to maybe a dozen.  While remnants of the group engaged in fighting in Afghanistan against coalition forces, its web master recognized that Jamshid Muhtorov's "main goal was to overturn the existing totalitarian regime in Uzbekistan and to free Muslim people, suffering under this regime."

Mr. Muhtorov was not shy about his opinions about Uzbekistan, religion, politics – he expressed them loudly and often to anyone who would listen and to some he did not know were listening.

In a July 21, 2006, interview of Mr. Muhtorov during his exile in Osh, Kyrgyzstan, filmmaker Michael Andersen asked: "[W]ould it be better for you to simply sit quiet, work in Dzkizak [Jizzak] and don't deal with all the human rights activism? Just work and stay quiet?"  Mr. Muhtorov replied from an Uzbek poem, "A person cannot be called a person if he's not interested in the fate of his own people." He went on, "The fate of my people is my fate."

From the hindsight vantage point of nearly seven years in jail, it would have been easier for Jamshid Muhtorov to "just work and stay quiet" once he got to America.  But that is not who he was or is.

Whatever the sentence, Mr. Muhtorov, once a prominent human rights activist, a man with no criminal record, faces an uncertain future – ICE has a "hold" lodged against him. He cannot be deported to Uzbekistan on peril of his life. If no other country will accept him, he could end up in the same limbo as the Mariel Boat People, indefinitely detained by immigration, literally a man without a country.

## I.

## <u>STATEMENT OF THE CASE</u>

Mr. Muhtorov was convicted of counts one, two and three of the superseding indictment. Each count dealt, generally, with attempting to provide material support to the I.J.U., a designated terrorist organization. The first two counts, one a conspiracy, focused on material support in the form of $300.00. The third involved an attempt to provide material support in the form of personnel, Mr. Muhtorov himself.

A fourth count alleged an attempt by Mr. Muhtorov to provide material support to the I.J.U. in the form of communications equipment and services. The jury found Mr. Muhtorov not guilty of that charge. Doc. 1898, verdict.

## II.

## FACTS OF CONVICTION

Mr. Muhtorov is clear about the reality of the jury's verdicts that he is guilty of the three charges. What this says about the facts is less clear. Until 1728, juries in Scotland could return two verdicts in criminal cases: proven and not proven. The verdicts here indicate the three counts were considered "proven" by the jury, but what they tell us beyond that is impossible to say.[2]

Whatever the verdicts may mean, the government's "facts" found at pages two through eight of their Statement are not a complete picture of what developed at Mr. Muhtorov's trial. They are, rather, a select synopsis supporting the prosecution's theories. Absent special verdicts, or findings of fact by the jury, there is no way to know which facts the jury may have found were established (*i.e.,* were proved beyond a reasonable doubt), were important, or supported their verdicts. The Court, having presided over the trial, will have the complete picture in mind.

Jamshid Muhtorov is a forty-two-year-old citizen of Uzbekistan. When he was born, June 28, 1976, in the city of Jizzak, Uzbekistan was still part of the Soviet Union. The populace of Uzbekistan (itself an artificial construct of the soviets, created from whole cloth in the aftermath of the Russian revolution)[3], practiced Islam for centuries. Under the soviet regime, religious

---

[2] "The Anglo-American criminal trial employs the adversary system to resolve disputes. This system, under which each side tries to win by all legal and ethical means, may be conducive to truth in the long run, but it does not always produce truth in a given case." Alan Dershowitz, *Is the Criminal Trial a Search for Truth?* P.B.S. Frontline, https://www.pbs.org/wgbh/pages/frontline/oj/highlights/dershowitz.html (visited July 26, 2018)

[3] The Soviet government established the Uzbek Soviet Socialist Republic as a constituent (union) republic of the U.S.S.R. in 1924. According to Steve Swerdlow, "All five of the Central Asian countries were subsumed in or part of -- and, in fact, one could say, even created by -- the Soviet system, which lasted until 1991, at which point all five broke apart and became independent countries." (Trial testimony, June 12, 2018).

expression was, to put it mildly, frowned upon, and Muslims viewed with suspicion. Repression and oppression were watchwords of the communists, whose "top man," or general secretary, was Islam Karimov.  The soviet security apparatus was the KGB.

Jamshid Muhtorov is the oldest of five children, all born in Uzbekistan. His mother, Robiya Muhtorova, and father, Asror Muhtorov, are college graduates. Robiya Muhtorova for years taught German and English. Asror Muhtorov is a surgeon.

For the first fifteen years of his life, Jamshid Muhtorov lived and was educated under the soviet system.  He attended high school (secondary school) in Jizzak where he was a checkers champion, and graduated in 1992, one year after Uzbekistan became "independent" with the Soviet Union's disintegration. Mr. Muhtorov never served in the military.

Some things in Uzbekistan did not change — for the better — with independence.  One was Islam Karimov.  Karimov, the Uzbekistan communist party's former first secretary, became Uzbekistan's first president in 1991, a post he occupied, despite term limits, until his death in 2016.  Crackdowns on religious and political freedoms did not change they intensified.  There was a change in name only of the Uzbek secret police, from KGB to SNB.  The brutality of the SNB was marked by documented cases of false imprisonment, beatings, and torture of Uzbek citizens.[4]

Jamshid Muhtorov was not particularly "political" or religious growing up. After high school, he spent a year working, and went on to university in Jizzak, where, in 1997 he received his bachelor's degree. For the next several years, he worked at various jobs.  He grew

---

[4] One form of torture, documented by international organizations and testified about at trial, was boiling people alive. ("They were immersed in a vat of boiling water.") Another was the "bag of death."" ([T]hat's where they put the plastic bag over your head and strangle you.") Testimony of Steve Mark Swerdlow, Esq., Human Rights Watch, June 12, 2108.

increasingly conscious of, and troubled by, the brutality of the Karimov regime and its treatment

of farmers, who, since 1991 could own land. *That* change did not stick, however, as the new

government began a systematic program of expropriation of private property.[5]

In 2001, two important events occurred in Mr. Muhtorov's life.  He met and married his

wife, Nargiza, and started a new job working in the Jizzak branch of Ezgulik, the only

government-chartered human rights organization in Uzbekistan.  Ezgulik worked to protect

farmers' rights to their property.  This put them in opposition to the regime's program of land

expropriation.

As the head of the Jizzak branch, Jamshid Muhtorov represented farmers, often in court.

Because of his work, he had regular contact with foreign embassies and NGO's, including

Human Rights Watch.

In May of 2005, there was another change.  A horrific one. Karimov sent his troops to

surround a large, and peaceful, gathering of citizens (thousands) in the Uzbek city of Andijan.

People assembled in the town square to protest the arrest of local businessmen who had conflicts

with the regime.  Without warning, Karimov's troops opened fire, killing hundreds of unarmed

men, women, and children.

---

[5] Michael Andersen, the Danish filmmaker, who testified on June 11, 2018, described Ezgulik's
work this way: "They worked primarily in the Uzbek provinces. There was a big thing that in the
Soviet Union, all the land was owned by the state. And Ezgulik was trying to fight to help the --
to put pressure on the state to give the land to the small peasants. And also when the peasants
managed to buy the land, they were quite often put under pressure from local government to, you
know, ask for bribes, or their harvest was confiscated by the local government, so you would go
and sell it."

Danish documentary filmmaker Michael Andersen lived just across the border from Andijan in Osh, Kyrgyzstan at the time.   When he tried to enter Uzbekistan to discover what had happened  his visa was torn into pieces by the border guards.

An immediate international outcry followed the massacre, despite Karimov's best efforts to conceal the truth; efforts that included mass burials of victims and hosing down the square to remove all traces of the carnage.

In Andijan's aftermath, thousands of Uzbeks fled the country, many to neighboring Kyrgyzstan.  There was an immediate crackdown by the SNB on anyone who dared to speak out about the massacre. Jamshid Muhtorov did. In the months following the massacre, he met with foreign embassies, distributed leaflets and pamphlets telling the truth about what had happened, was threatened, arrested, and twice was beaten.  The second time, in late 2005, he was left unconscious, lying in the street.[6]

At the end of 2005, Jamshid Muhtorov was warned by fellow activists he was about to be arrested. He first made his way to the capital, Tashkent, where friends hid him, one of whom was Elena Urlaeva, another human rights leader.  Ms. Urlaeva loaned Mr. Muhtorov one of her coats, and, disguised as a woman, he gave the secret police the slip and crossed into Kyrgyzstan. A few days later his wife and two children joined him in Osh.

In July 2006, while he and his family were in exile in Osh, Michael Andersen contacted and interviewed Mr. Muhtorov.  Mr. Andersen was making a documentary about the Andijan massacre for the Danish government. Parts of his interviews were played at trial.

---

[6] This is when his nose was broken. This event was documented in a Human Rights Watch Report, referred to at trial by defense witness, and HRW Central Asia expert, Steve Swerdlow. Exhibit 658, dated November 25, 2005, is an Uzbek medical certificate documenting the injuries.

Just before the second of the tapings, Mr. Andersen received word the Uzbek secret police were about to kidnap Mr. Muhtorov and forcibly return him to Uzbekistan. (Both Mr. Andersen and Steve Swerdlow of Human Rights Watch testified how the SNB  kidnapped Uzbeks from Kyrgyzstan and Kazakhstan with impunity.) Mr. Andersen gave Mr. Muhtorov money so he, his wife, and children could flee Osh to the relative safety of Kyrgyzstan's capital, Bishkek.

In Bishkek, the family applied through the United Nations High Commission for Refugees (UNHCR) for political refugee status. This process, and later vetting by the U.S. Department of Homeland Security and I.C.E., involved confirming that Mr. Muhtorov qualified as a political refugee and had no ties to terrorist organizations. Approved for admission to the United States as refugees, the Muhtorovs relocated to Denver in 2007.

Here they met representatives of Lutheran Family Services, or LFS, one of whom, Ruthann Kallenberg, a volunteer, worked closely with them to help in their transition. (Ms. Kallenberg, a witness at trial, remains a close family friend.) No one in the family spoke English when they first arrived in Denver, one of many challenges they faced.  Despite this, helped by LFS, Mr. and Mrs. Muhtorov found work almost immediately: Mrs. Muhtorova as a maid, and Mr. Muhtorov, at first, as a janitor in a local casino.[7]

Although Mr. Muhtorov had a college degree and for years had been a leader in the human rights movement in Uzbekistan, his experience did not translate to well-paying jobs. This led  him to attend a commercial truck driving school (taught in Russian) in 2009. The school was in Philadelphia where Mr. Muhtorov met fellow Uzbek, Bakhtiyor Jumaev,  with

---

[7] Mrs. Muhtorova is still employed by the same hotel

whom he stayed while attending the course. When some months later Mr. Jumaev was arrested by immigration, Mr. Muhtorov contributed money toward his immigration bond.[8]

In the years that followed, up to the time of his arrest in January of 2012, Jamshid Muhtorov worked as a long distance truck driver. He closely followed political developments in Central Asia, and visited websites sponsored by opposition groups, one of which, sodiqlar.com, was affiliated with the I.J.U.[9]

Mr. Muhtorov also talked with family and friends about the plight of his youngest brother, Hurshid, who remained behind in Central Asia.[10] Hurshid Muhtorov, who, like his brothers had fled Uzbekistan, was unsuccessful in his earlier attempt to get refugee status. He lived in Kazakhstan, a place where, in 2011 and 2012, he was in danger of being kidnapped by agents of the SNB.[11]

In March of 2011, a check for $300.00, on the account of Ilkhom Sobirov, was mailed to Mr. Muhtorov at his home address in Colorado. Although on Mr. Sobirov's account, the funds came from Mr. Jumaev. Mr. Jumaev and Mr. Muhtorov talked about whether the check had arrived. When it did, in early April 2011, Mr. Muhtorov was on the road. Nargiza Muhtorova deposited it to her account on April 9, 2011, and spent it on household items. By the end of

---

[8] Mr. Muhtorov contributed $500.00.

[9] Government Exhibit 9 is a February 16, 2012, public statement issued by the I.J.U. after Mr. Muhtorov's arrest. Among other things, it said, "Jamshid Muhtorov's main goal was to overturn the existing totalitarian regime in Uzbekistan and to free Muslim people, suffering under this regime."

[10] The third brother, Asil Muhtorov, was granted refugee status and moved to Colorado in 2009.

[11] One of Mr. Andersen's films, "The Long Arm of the Dictator," chronicled an assassination attempt on an Uzbek Muslim cleric who was living in exile in Sweden. The Imam, Obidhon Nazarov, was considered a threat by Karimov, whose SNB engineered the attempt. At trial, on June 11, 2018, Mr. Andersen was asked, "Did the danger to family members, or human rights activists, this kind of kidnapping, did it extend through 2012?" He answered, "Oh, yes, it did. It is still in existence, but it certainly was -- in 2012, I believe 30, 40 people, Uzbeks and family members of Uzbeks, were delivered, so to speak from Kazakhstan back to Uzbekistan.

April 2011, the balance in that account was zero. There was no evidence this $300.00 made it to the I.J.U.

On March 23, 2011, Mr. Muhtorov emailed to the sodiqlar website, expressing his desire to swear allegiance. The offer was not accepted.[12]

As 2011 drew to a close, Mr. Muhtorov firmed up plans to travel to Central Asia. He scratched together money, including some from his brother, Asil Muhtorov.  He gathered dozens of documents, including many related to Hurshid's personal situation and others from his own experience in applying for refugee status. He planned to use these to assist Hurshid in applying (or reapplying) to become a refugee.[13]  He continued to communicate with Hurshid, often by Skype, about when he would arrive, and what the two would do once he got there. The idea was for Mr. Muhtorov to fly to Istanbul, Turkey. From there he would travel to Kazakhstan and meet up with Hurshid, after which the two would return to Istanbul to work on getting Hurshid refugee status.

---

[12] The I.J.U. public statement, referred to in note 10, was "made by the Islamic Jihad Union in response to various media reports pertaining to the arrest in the USA of Jamshid Muhtorov, a political refugee from Uzbekistan, and to his association with [the] IJU." Among other things, the public statement says Mr. Muhtorov asked for permission to join them, but they "did not rush with our consent." Although Mr. Muhtorov suggested he would take an oath of allegiance, it was not accepted, but was "met with silence." The public statement reported that Mr. Muhtorov said, "if the Union agrees to his coming, he can bring some 'wedding gifts.'" But, "[s]ince he still didn't receive an affirmative response, he stated that he got offended and said he would possibly go to his old acquaintances in Turkey, join the People's Movement of Uzbekistan headquartered there, and together with them work on overthrowing the Uzbekistan regime."

[13] These documents were found in Mr. Muhtorov's luggage when he was arrested and introduced as trial exhibits 606 to 688. In addition to a blank refugee application, there were Hurshid Muhtorov's birth certificate (653 and 653A), a medical record from Jizzak, Uzbekistan, of Hurshid having been beaten in April of 2005 (659 and 659A), the UNHCR refugee resettlement forms for Jamshid Muhtorov and his family (680), and several documents confirming Jamshid Muhtorov's work with Ezgulik in Uzbekistan, including a list of the members of its Jizzak regional branch showing Jamshid Muhtorov as chairman.  (Exh. 664 and 664A).

Mr. Muhtorov also talked with an FBI informant during the last months of 2011. The informant posed as an Uzbek expatriate living in Germany. He offered to help settle Hurshid in Germany. In one email, the informant relayed links to satellite phone vendors given him by the FBI so Mr. Muhtorov could pass them along to sodiqlar.com.[14]

At page 7 of its Statement, the government cites a call between Mr. Muhtorov and the informant on January 14, 2012, Exhibit 167A, for this proposition: "MUHTOROV also told the CHS [confidential human source] about how he envisioned returning to the U.S. only with a weapon in one hand and a Quran in the other."

The exchange is copied below. "CHS" is the informant. "JM" is Mr. Muhtorov. There is no mention of America, or returning to America, with or without a weapon or Quran. The informant talks about marching "there" with an enormous Islamic banner, but says, "there are only three or four days left."

This conversation was a week before Mr. Muhtorov's arrest, when he had planned to fly to Turkey from Chicago. (Exhibit 150A, a call January 11, 2012, starts with Mr. Muhtorov telling Mustafa Gayayev, a friend, that he is heading to Chicago, driving on route 24.) The fair inference is "there," meant Uzbekistan. Reading on further in the conversation, the "weapon" is described as a passport.

---

[14] Again, the jury acquitted Mr. Muhtorov of the count charging him with attempting to provide communications equipment to the I.J.U..

| JM: | [UI] |
|---|---|
| CHS: | Yes, speak please, speak. I'll tell it later. |
| JM: | When Muslim has a weapon in one hand and the Quran in the other, there is respect and consideration for him at that time. The hypocrites won't speak. No one will get immoral with you, or conspire against or slander you. |
| CHS: | Hmm. |
| JM: | [UI]…as they say. …this book |
| CHS: | Hmm. |
| JM: | That's how we get there. There will be the Quran instead of passport. The Quran will be our way! The Quran will be our constitution. |
| CHS: | Yes. God willing. And our green card will be the Quran wouldn't you say? Oh Lord. |
| JM: | And our passport will be the weapon. The weapon. |

There is another piece to this weapon in one hand and Quran in the other business not mentioned in the government's Statement. This is in the same exhibit mentioned above, 150A, in the conversation between Mr. Muhtorov (JM) and Mustafa Gayayev (MG) on January 11, 2012. The relevant part is listed on the next page. Two things are clear. One, this swimming with a weapon in one hand and a Quran in the other (or the other way around) is a joke. (Note Mr. Gayayev "chuckling.") Second, the reference is to swimming in the *Syrdarya* River. The Syrdarya, or Syr Darya, is a river in Central Asia that flows between Kazakhstan and Uzbekistan. Regardless of the direction one is swimming, it has nothing to do with America.

MG:         [OV] When will we go to swim in the ocean again?

JM:         We will swim in Heaven, God willing.

MG:         [Chuckles]

[Pause]

JM:         Or, with God's blessings, we will swim in the Syrdarya river, in Syrdarya--

MG:         Yeah.

JM:         --with a weapon in one hand and with the Quran in the other.

MG:         Yeah.

JM:         Or, we have the Quran in one of our hands and a weapon in the other.

MG:         [Chuckles]

What is the point of the government's claim that Mr. Muhtorov "envisioned returning to the U.S. only with a weapon in one hand and a Quran in the other?"  If to suggest Mr. Muhtorov planned to engage in an act of terrorism inside the U.S., that suggestion is belied by the evidence and by the U.S. Attorney's Office press release of January 23, 2012, one sentence of which says, "The government does not allege that Muhtorov was plotting attacks against any targets inside the United States." *See* Exhibit 732.[15]

---

[15] The government also cites a call in Exhibit 146A from Mr. Muhtorov to his daughter where he asks her to "pray for him to become a martyr."  If this is meant to suggest Mr. Muhtorov intended to die fighting in Central Asia (one must be dead to be martyred), that is contradicted by the government's argument that Mr. Muhtorov planned to have his wife and children join him there. Statement, Doc. 1927, p. 8. Saulius Tamavicius. Mr. Tamavicius, owner of RSA, a trucking company based in Chicago, had employed Mr. Muhtorov as a driver. Mr. Muhtorov dropped his truck off with Mr. Tamavicius on January 20, 2012, the day before he was arrested. Mr. Muhtorov quit his job that day and told Mr. Tamavicius he was traveling to Istanbul "to help his brother," but "he'd be coming back."

Mr. Muhtorov was arrested on January 21, 2012 at O'Hare Airport as he prepared to board a flight to Istanbul.. In his luggage were documents relating to Hurshid  Muhtorov's application for refugee status. There were also business suits, lots of candy and gift items (most of which came from the hotel where Mrs. Muhtorova worked), and a few iPhones and an iPad still in the packaging.

Mr. Muhtorov had about $2,800.00 in cash, much of which his brother, Asil Muhtorov, testified he contributed.  The cash was to be used to finance the expenses of Jamshid Muhtorov's trip to Central Asia, expenses that included food and lodging, and the cost of flights to and from Kazakhstan or Kyrgyzstan to Istanbul, Turkey, for both Jamshid and Hurshid. Neither Asil nor Jamshid knew how long it might take to get done what needed to be done.[16]

---

[16]  At trial, Nargiza Muhtorova testified: "I asked my husband why he was buying a one-way ticket. He told me he would fly to Turkey, and he didn't know how long it would take him to solve Hurshid's issue in Kazakhstan and in Turkey." Asil Muhtorov testified that the money Jamshid had with him "would be spent for rent, for food, for transportation, and we didn't know how long it would take for him to bring the documents to the U.N."   When asked if he or Jamshid knew exactly how long the process of helping Hurshid might take, he answered: "We didn't know exact -- exact time, how long it would take. I think that even for simple thing, dealing with the U.N., it would take several months. "

# III.

## SENTENCING COMPUTATION

Mr. Muhtorov reiterates the arguments he made in Doc. 1918, Defendant's <u>Memorandum Regarding Sentencing Guidelines and Adoption of Arguments made by Bakhtiyor Jumaev in Docs. 1908 and 1910</u>. He acknowledges the <u>Court's Notice of Rejection of the U.S. Sentencing Guidelines</u>, Doc. 1932, and concurs with its analysis about the inapplicability of the Guidelines in its <u>Memorandum Opinion and Order on Sentencing</u>, Doc. 1920.  What follows are Mr. Muhtorov's calculations. These are made only because, as part of sentencing, the guidelines must be correctly calculated.

### Base offense level

The base offense level for the three offenses of conviction (18 U.S.C. § 2339B, attempting, conspiring to provide material support to a terrorist organization) is 26. U.S.S.G. § 2M5.3.

### Grouping

The convictions are "grouped" for sentencing under U.S.S.G. § 3D1.2 (b).

### There was not proof, by a preponderance, any support was "directed at and designed to" assist in the commission of a violent act within the meaning of U.S.S.G. § 2M5.3 (b) (1(E)

There should be no specific offense characteristic increase under U.S.S.G. § 2M5.3 (b) (1(E). This adjustment applies only when the government proves by a preponderance of the evidence that Mr. Muhtorov attempted to provide $300.00, or himself, to

the I.J.U. "with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act." *Id.*[17]

### The $300.00

The government argues that "the defendant had at least a 'reason to believe' that the funds he sought to provide to the IJU would be used to obtain dangerous weapons or firearms and that the funds would be used to commit or assist in the commission of violent acts . . . [and] the defendant sought to provide himself as personnel . . . and expressed his desire to participate in violent acts himself." Statement, p. 9.

Actually, the evidence does not prove  by a preponderance that Mr. Muhtorov had reason to believe any funds he might have hoped to (but never did) provide to the I.J.U. would be used to commit or assist in the commission of violent acts. Mr. Muhtorov knew the organization engaged in fighting, but the evidence, including one video, Exhibit 315, suggests he knew they did *other* things: like teaching children boxing, martial arts, caring for orphans, doing dental work, and putting on feasts at weddings.[18]

While "Section 2M5.3(b)(1)(E) . . . does not require . . .  that support be . . . designed to lead to a specific act of violence . . .  it does require is that the defendant[] be shown to have intended, known, or had reason to believe that [the] support *would be used* to assist in acts of

---

[17] The government has the burden of proof for sentence increases. "Evidence which does not preponderate or is in equipoise simply fails to meet the required burden of proof." *United States v. Kirk*, 894 F.2d 1162, 1164 (10th Cir. 1990).

[18]  On direct examination June 4, 2018,  the CHS testified about a video he and Mr. Muhtorov discussed, Cry of the Orphans: "[W]hen [Mr. Muhtorov] showed [the] video called the "Cry of Orphans" to other brothers here, they were ready to contribute, and he -- he goes on and says, I told brothers, 100, 200, $300 is not a big deal for us, let us contribute, but despite all these difficulties they're having, they're not telling me how to send the money. . ."

violence by the terrorist organization." *United States v. Dhirane*, 17-4205, 2018 WL 3421085, at

*7 (4th Cir. July 16, 2018) (emphasis added)

(§ 2M5.3 (b) (1) (E) application upheld when defendants' support was "directed at and designed

to support al-Shabaab's [a terrorist organization] military operations in fighting a war of

terrorism in Somalia and Kenya.")

Not *could* be used. Not *might* be used.  But, wo*uld* be used.  And, any support must have

been "directed at and designed to" support violent activity.

The informant testified that Mr. Muhtorov "was telling me about his hope when he

travels, he's going to bring some goods to orphans, some warm clothes, stuff like this, and he

goes on also and says, he wants to save up his money because when he goes there, the orphan

kids, they have mothers, widow of shahids, so he wants to bring to the mothers cash, clothing,

warm stuff for the kids and to their mothers . . ." [19]

The evidence does not prove, by a preponderance, Mr. Muhtorov intended or had reason

to believe financial support *would* be used, was directed at and designed, to support acts of

violence – as opposed to being intended to provide non-violent help to women and children. The

adjustment under § 2M5.3 (b) (1) (E) does not apply.

---

[19] Dr. Guido Steinberg testified at trial: "The IJU started in roughly 2008, 2009 telling its
followers, this is -- this is a family place, you can bring your families, you can bring your kids.
We've got a school, we've got free housing, we've got free medical treatment." Also, in
describing Qaboilda, one of the series of videos he discussed, Dr. Steinberg testified that
the series "shows potential recruits that if you come to the tribal areas, *you do not only fight*, but
you are able to lead a truly Islamic life. You can bring your kids, because there is a school; there
is a doctor; there is free medical treatment; there are weddings going on; you can find a woman if
you go there; so everything -- that is included in the whole series." (emphasis added).

### Personnel (himself)

The government also argues the enhancement applies to sentencing on the "personnel" charge because "the defendant . . . expressed his desire to engage in violent acts himself." Statement, p. 9.  Again, what must be proved by a preponderance is that Mr. Muhtorov intended his work, as personnel, *would* (was directed at and designed to) support acts of violence.

Even the government, in its Statement, pp. 7-8, concedes that Mr. Muhtorov told the CHS "the IJU planned to have him work on propaganda when he arrived." They cite to Exhibit 168A, at p.12, which contains this exchange on January 18, 2012, three days before Mr. Muhtorov's arrest:

> JM: Those there tell me that I will work on propaganda, at propaganda when I get there, you know.
>
> CHS: Hmm.
>
> JM: At the propaganda unit.
>
> CHS: Hmm.
>
> JM: They don't want to deploy me to the wedding.
>
> CHS: I didn't understand what you are saying.
>
> JM: If I go to the wedding I'll be working on the invitations and stuff.
>
> CHS: Yes. Yes. Yes.
>
> JM: Sending out invitations and similar things.

And when Mr. Muhtorov protested to the CHS he did not want to do "that," he wanted to go to the "wedding," this ensued:

| JM: | They said no, when I told them that. You just sit tight and that's all. [Laughter] |
| CHS: | [Laughter] Oh, yes. Oh, Good Lord. |
| JM: | [UI] It is called a propaganda and recruitment unit, you know.  They said I would go to their propaganda and recruitment unit. |
| CHS: | Oh yes. |

So, just a few days before he was to fly to Istanbul, the evidence shows that Mr. Muhtorov had "reason to believe" the use to which he *would* be put by the I.J.U. was as a propagandist or recruiter. Performing either role does not involve acts of violence.

### **Obstruction of Justice**

In its Statement, the government argues there should be a two level adjustment under § 3C1.1, the obstruction of justice provision.[20] They contend Mr. Muhtorov repeatedly perjured himself. Statement, Doc. 1927, pp. 10-11; the same claim they made in Mr. Jumaev's case, using the same word, "lies."

As the Court observed in rejecting this claim in Mr. Jumaev's guidelines analysis, citing *United States v. Dunnigan*, 507 U.S. 87, 95 (1993), "not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury."  A passage

---

[20] § 3C1.1. Obstructing or Impeding the Administration of Justice
If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

particularly apt here: A defendant's "testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or prove lack of intent." *See United States v. Smith*, 62 F.3d 641, 647 (4th Cir. 1995) ("An enhancement under § 3C1.1 does not apply automatically every time a criminal defendant who testifies at trial is convicted. It may be that the defendant's specific statements on the stand were true, or were not intentionally false, or were not material.")

"[I]f a defendant objects to a sentence enhancement resulting from [his] trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same…" *Dunnigan, supra*, at 95.[21]

Mr. Muhtorov agrees with the Court's concerns about the "trial tax" implicit (or explicit) in § 3C1.1's enhancement as expressed in the Jumaev sentencing order. Doc.  1920, p. 14.[22] But, in guideline terms, and as it relates to the government's attempt to punish Mr. Muhtorov for "obstruction" based on  a claim he perjured himself  while testifying, that attempt must fail as the

---

[21] The Tenth Circuit's standards are stricter than those expressed in *Dunnigan. United States v. Hawthorne*, 316 F.3d 1140, 1146 (10th Cir. 2003). *See United States v. Massey*, 48 F.3d 1560, 1573 (10th Cir. 1995)(If the 3C1.1 enhancement is based on trial testimony, the district court must make specific findings – independent of the jury verdicts -- as to the elements of perjury and specifically identify the statements it concludes were perjurious.)

[22] "[I]it is improper  . . . to penalize a defendant for exercising his constitutional right to plead not guilty and go to trial, no matter how overwhelming the evidence of his guilt." *United States v. Frost*, 914 F.2d 756, 774 (6th Cir. 1990). *Quoting United States v. Derrick*, 519 F.2d 1, 3 (6th Cir.1975). *See also United States v. Marzette*, 485 F.2d 207, 207 (8th Cir. 1973) ("[W]hether a defendant exercises his constitutional right to trial by jury to determine his guilt or innocence must have no bearing on the sentence."); *Baker v. United States*, 412 F.2d 1069, 1073 (5th Cir.1969) ("An accused cannot be punished by a more severe sentence because he unsuccessfully exercised his constitutional right to stand trial rather than plead guilty.")

government has not met its burden of proof with either the requisite specificity or by a preponderance of the evidence.[23]

### The Guidelines offense level without § 3A1.4

The government argues the "terrorism enhancement" under U.S.S.G. § 3A1.4 – with its double whammy of an increase in the Criminal History Category to VI and enormous leap in offense level – applies to Mr. Muhtorov's sentencing. Mr. Muhtorov filed a separate pleading, Doc. 1918, Defendant's Memorandum Regarding Sentencing Guidelines, etc., arguing against applying the terrorism enhancement. The Court, in its Memorandum Opinion and Order on Sentencing in Mr. Jumaev's case, Doc. 1920, explained its reasons for not applying the enhancement to his sentencing.

If U.S.S.G. § 3A1.4 is not applied in Mr. Muhtorov's case, the total offense level without an upward adjustment for obstruction under § 3C1.1 or an enhancement under § 2M5.3(b)(1)(E), would be 26.[24]

Mr. Muhtorov has no record. See Doc. 1929, first disclosure Presentence Report, ¶¶ 45-51. His Criminal History Category is I.[25]

---

[23] *United States v. Smith*, 62 F.3d 641, 646–47 (4th Cir. 1995) (the government cannot secure a sentencing enhancement on the grounds of perjury unless it proves each of the elements of perjury -- (1) false testimony (2) concerning a material matter (3) given with the willful intent to deceive -- by a preponderance of the evidence.)

[24] Mr. Muhtorov does not concede that the lack of at least a two offense reduction under § 3E1.1 for so-called "acceptance" is anything other than a backhanded trial tax. See Ellen M. Bryant, Section 3E1.1 of the Federal Sentencing Guidelines: Bargaining with the Guilty, 44 Cath. U. L. Rev.1269, 1275 (1995) (acknowledging judicial criticism of 3E1.1 as punishing a defendants' exercise of their right to trial.) Untaxed, his offense level would be 24.

[25] Mr. Muhtorov later argues there are grounds for a downward departure under U.S.S.G. § 4A1.3 to category I in the event § 3A1.4's "bump" to category VI were applied.

**The guidelines imprisonment range without the terrorism enhancement**.

At offense level 26, and criminal history category I, the sentencing guidelines imprisonment range is **63 to 78** months. Reducing the offense level to 24 to compensate for imposing the "no acceptance for you" trial tax, makes the range **51 to 63** months.

By the date of sentencing, Mr. Muhtorov will have served 2,413 days, just over 79 months. *See* Doc. 1929, first disclosure Presentence Report, p. 2 "Release Status." This is more than the top end of either range. In addition, with good time (18 U.S.C. § 3624(b)) the time he has served is the equivalent of a sentence of *92* months, or about 7 years and 7 months.[26] In jail. Not a correctional institution.[27]

**Does the § 3A1.4 terrorism enhancement apply to Mr. Muhtorov's guidelines calculation?**

U.S.S.G. § 3A1.4 applies to the guidelines calculations if the predicate offense either (1) "involves" a federal crime of terrorism, or (2) was "intended to promote" a federal crime of terrorism. *United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010).

Mr. Muhtorov's memorandum, Doc. 1918, and the Court's Memorandum Opinion and Order in Mr. Jumaev's sentencing, Doc. 1920 (07/18/18), analyze the structural problems with the terrorism enhancement, U.S.S.G § 3A1.4. Mr. Muhtorov adopts the reasoning in both.

---

[26] Six years and 7 months, the time Mr. Muhtorov has served, is 79 months. Using the probation officer's offense level – with obstruction and the U.S.S.G § 2M5.3(b)1(E) enhancement but *without* the terrorism enhancement  or a reduction for acceptance – is **30**. At that level and Criminal History Category I, the guidelines range is **97 to 121** months. With good time, the range of actual imprisonment is **84 ½ months to 105 ½ months**.

[27] Not that a federal B.O.P. facility would be better. Some convicted terrorists are held in "special Communications Management Units, designed to isolate certain prisoners from other inmates and limit contact with the outside world. Mail and telephone calls are restricted. Prisoners in the units are not allowed to have any physical contact with visitors or family members. The majority of prisoners in the units, which were opened in 2006 and 2008, are Muslims." *See* The Terrorists in U.S. Prisons.
"https://www.nytimes.com/interactive/2016/04/07/us/terrorists-in-us-prisons.html

Section 3A1.4 contravenes the principles of sentencing set out in 18 U.S.C. § 3553.  In particular the principle in § 3553(a) that a sentence not be greater than necessary to comply with the statute's objectives and § 3553(a) (1) requiring "the nature and circumstances of the offense and the history and characteristics of the defendant" be considered.

The nature and circumstances of material support cases – what we are dealing with here – vary, often widely. The history and characteristics of those convicted of such offenses do as well.[28]

But, the guidelines must be correctly calculated, which leaves the question whether, under the facts in Mr. Muhtorov's case, **§ 3A1.4** applies to his guidelines calculations.

This depends on two things. First, did the offenses of conviction either (1) "involve" a federal crime of terrorism, or (2) were they "intended to promote" a federal crime of terrorism.

**The first prong, did the offenses "involve" federal crimes of terrorism?  The specific intent requirement.**

"[A] defendant's offense 'involves' a federal crime of terrorism when his offense includes such a crime, *i.e.*, the defendant committed, attempted, or conspired to commit a federal crime of terrorism as defined in 18 U.S.C. § 2332b(g)(5)."  *United States v. Awan, supra* at 313.

All three of Mr. Muhtorov's offenses of conviction are listed in § 2332(g)(5)(B). However, as the Court noted in the Jumaev Memorandum, that an offense of conviction is "listed," does not end the inquiry on the "involved" prong. Doc. 1920, pp. 10-11.

Commission of a crime listed in § 2332b(g)(5)(B) only satisfies the "involved" prong of the terrorism enhancement if "the government shows by a preponderance of the evidence that [the defendant] had the 'specific intent'. . . to commit an offense that was 'calculated to influence

---

[28] Indeed, these factors are different in Mr. Jumaev's and Mr. Muhtorov's cases, even though they are codefendants.

or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct.'" *United States v. Awan*, *supra,* at 317. "'Calculation'is concerned with the object that the actor seeks to achieve through planning or contrivance." *Id*. It is distinguished from motive, and requires "that the underlying felony [be] calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id*.

Thus, to satisfy the first of the two prongs for application of § 3A1.4, the evidence must prove, preponderate, that Mr. Muhtorov had the specific intent to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. [29]

In arguing for application of the terrorism enhancement, the government says:

"The record is replete with evidence that MUHTOROV intended to retaliate against the actions of both the Uzbek and United States Government. Further, the offense conduct here was plainly one that 'involved, or was intended to promote,' the crimes listed above.  U.S.S.G. § 3A1.4(a).  Violations of 18 U.S.C. § 2339B, the counts of conviction, are specifically listed in the definition of a "Federal crime of terrorism." Statement, Doc. 1927, p.10.

---

[29] The term "government" as used in § 2332b(g)(5) includes both U.S. and foreign governments. *United States v. Aref*,  2007 WL 804814, at *2 (N.D.N.Y. Mar. 14, 2007). And, it doesn't appear to matter how awful the "government" may be.  "Congress did not intend for a United States district court judge to determine whether a foreign state is complying in full with its international obligations before determining whether a person guilty of providing support to a foreign terrorist organization is subject to § 3A1.4." *United States v. Assi*, 428 Fed. Appx. 570, 575 (6th Cir. 2011). That Mr. Muhtorov hoped for the fall of one of the world's most brutal dictators may, however, be relevant to § 3553(a)'s analysis of the "nature and circumstances of the offense."

Compare this passage from the government's sentencing statement in *Mr. Jumaev's* case:

"The record is replete with evidence that JUMAEV and MUHTOROV intended to retaliate against the actions of both the Uzbek and United States Government.   Further, the offense conduct here was plainly one that "involved, or was intended to promote," the crimes listed above.   U.S.S.G. § 3A1.4 (a).   Indeed, violations of 18 U.S.C. § 2339B, the counts of conviction, are specifically listed in the definition of a 'Federal crime of terrorism.'" Doc. 1884, p. 10.

Focusing just on the "retaliate against the U.S. government" claim, the record is anything but "replete," meaning "crammed, packed, jammed, teeming, overflowing," with evidence either Mr. Jumaev or Mr. Muhtorov specifically intended to retaliate against the actions [the statute says "conduct"] of the *United States* Government.

The prosecution says Mr. Muhtorov expressed his anger with the U.S. Government. Statement, p. 10.  Expressions of anger are not proof - by a preponderance – of a specific intent to retaliate against United States Government conduct.

They also claim Mr. Muhtorov had a "desire" to participate in "the fighting." *Id*. What fighting? Against whom? The fair inference from the trial record is Mr. Muhtorov's beef was with Uzbekistan, not the United States.  And a "desire" to do something is not the same as a specific intent to do it, especially when we know what Mr. Muhtorov *knew* before his aborted attempt to fly to Istanbul:  that the "brothers" in the "nearly defunct" (Doc. 1920, p. 12) I.J.U. told him he would not be going to a wedding.  He would not be fighting or retaliating, but instead would be a propaganda person or a recruiter. [30]

---

[30] As mentioned in note 13, supra, the I.J.U.'s public statement – issued just after Mr. Muhtorov's arrest --  basically said  Mr. Muhtorov wouldn't doing anything with them. He "got offended" when they didn't respond to his request to come and bring wedding gifts. Instead,

Most important, the evidence did not establish, by a preponderance, that Mr. Muhtorov specifically intended, by supplying money or himself, to influence or affect the conduct of the *U.S.* government by intimidation or coercion, or to retaliate against U.S. government conduct.

Nor did the evidence preponderate that Mr. Muhtorov had the specific intent to influence or affect the conduct of the Karimov regime "by intimidation or coercion," or to retaliate against its conduct. Again, he despised the dictator for what he had done to his country and his people. But, when he got ready to fly to Istanbul in January 2012, he knew he was not going to the wedding (meaning battle) and would not be an I.J.U. fighter. There is no evidence the I.J.U. was, in 2011 or 2012, operating in Uzbekistan. According to the I.J.U.'s sodiqlar.com post-arrest public statement (Dr. Steinberg was clear sodiqlar was the I.J.U.'s official website), Mr. Muhtorov was offended by their lack of responsiveness and would take his ball and go play with an entirely different bunch, the People's Movement, in Turkey. *See* footnote 29.  There was no evidence this group is a foreign terrorist organization, nor did the trial or the charges in the indictment have anything to do with them.

And, even if the I.J.U., the organization Mr. Muhtorov was supposed to be supporting, had rolled out the red carpet for Mr. Muhtorov and given him a deposit slip to their bank account (if they had one), there was no evidence they were in or operating in Uzbekistan at the time of his offense conduct and could have influenced, affected, or retaliated against the conduct of its government.  And, although some in the I.J.U. were fighting in Afghanistan, there was no evidence about exactly whom they opposed, other than some were American.  More important,

---

Mr. Muhtorov "said he would possibly go to his old acquaintances in Turkey, join the People's Movement of Uzbekistan headquartered there, and together with them work on overthrowing the Uzbekistan regime."

there is a complete absence of proof the "coalition" was a "government" within the meaning of the statute.[31]

What this means is there was a lack of proof on one of the two necessary elements of the "involved" prong of § 3A1.4, namely proof by a preponderance of the evidence that [the defendant] had the specific intent to commit an offenses 'calculated to influence or affect the conduct of [a] government by intimidation or coercion, or to retaliate against [a] government['s] conduct.'"

### Proof of the second prong of "intent to promote" is also insufficient

Even if proof is lacking that the predicate offenses "involve" a federal crime of terrorism, U.S.S.G. § 3A1.4 may still apply if the offense were "intended to promote" a federal crime of terrorism.

The '"intended to promote' prong applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism." *Awan, supra*, at 314. It is "applicable in some circumstances in which the 'involved' prong is not, *i.e.*, where the defendant's offense or relevant conduct does not include a federal crime of terrorism." *Id* at 314.

The facts in Mr. Muhtorov's case differ from Mr. Jumaev's. But, what the evidence showed was while Mr. Muhtorov may have wanted to support the I.J.U. by giving the group money, it doesn't show he ever did or even knew how to (or how to attempt to) do so.

Nor did the evidence establish by a preponderance that supplying himself as material support was with the requisite intent.  According to the I.J.U.'s public statement, Mr. Muhtorov,

---

[31]  In *Awan*, the government was India., 607 F.3d 310 . In *United States v. Graham*, 275 F.3d 490, 497 (6th Cir. 2001), it was the U.S. government. In *United States v. DeAmaris*, 406 F. Supp. 2d 748 (S.D. Tex. 2005), it was Columbia.

knew before he even attempted to fly out of O'Hare Airport for Istanbul, he was a rejected suitor. He was "offended" by the I.J.U.'s lack of enthusiasm. He could not have intended to provide himself to the I.J.U. when he knew they would not have him.

### Departures

Calculating departures is part of "consulting" the Guidelines.

Lee D. Heckman, The Benefits of Departure Obsolescence: Achieving the Purposes of Sentencing in the Post-Booker World, 69 Ohio St. L.J. 149, 185 (2008).

There are grounds for downward departure in Mr. Muhtorov's case.

### Section 4A1.3 downward departure for overrepresentation of criminal history

The first, and most obvious, ground for a downward departure is under U.S.S.G. § 4A1.3 and relates to the - and is necessary only if there is an - automatic bump due to the terrorism enhancement of Mr. Muhtorov's Criminal History category from I to VI. If there is, Mr. Muhtorov asks that the Court depart downward to his actual criminal history category, I.

In the Court's Memorandum Opinion, Doc. 1920, p. 17, when a district judge determines "that [the Terrorism Enhancement] over-represents 'the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes' [the court] always has the discretion under § 4A1.3 to depart downward in sentencing." *Citing United States v. Meskini*, 319 F.3d 88, 92 (2003). *See United States v. Benkahla*, 501 F.Supp.2d 748, 758 (2007). *See also* Defendant's Memorandum Regarding Sentencing Guidelines, Doc. 1918, pp. 10-12.

Without repeating the Court's analysis in the Jumaev Memorandum Opinion, to jump Mr. Muhtorov, a 42 year old with no criminal history, up to Category VI (a category populated

by those with the "worst of the worst" criminal records), "imports a fiction into the sentencing

calculus" and is unsupported by *any* reliable data

that a defendant convicted of a material support offense is more likely to be a recidivist." *See*

*United States v. Mehanna,* cited at page 17 of the Court's Memorandum Opinion, Doc. 1920.

Section 4A1.3 downward departures are appropriate when the criminal history category

substantially over-represents the seriousness of a defendant's criminal history or the likelihood

he will commit other crimes. The Application Notes for § 4A1.3 indicate that consideration

should be given to not only the number of previous offenses, but also the nature and vintage of

these offenses.  U.S.S.G. § 4A1.3, Application Note 3.

The analysis for Mr. Muhtorov is simple. The number of previous offenses is zero.  There

is no nature or vintage to consider. And, since Mr. Muhtorov has no record, nothing in it is a

predictor he is likely to commit "other crimes."  It is impossible for the over-representation of

the seriousness of  Mr. Muhtorov's non-existent criminal record to be more "substantial"  than

by assigning him from where he should be, Category I, to where § 3A1.4 automatically, and

without foundation, puts him, Category VI.

### Section 5H1.11 downward departures for Public Service, Record of Prior Good Works

The § 5H1.11 departure is one of those categorized as "not ordinarily relevant." This

means while downward departures under this category are discouraged, they are not forbidden in

exceptional cases. *United States v. Jared*, 50 Fed. Appx. 259, 261 (6th Cir. 2002), *quoting Koon*

*v. United States*, 518 U.S. 81, 109 (1996).  § 5H1.11 specifically allows departures for

extraordinary public service. *See e.g., United States v. Mehta*, 307 F. Supp. 2d 270 (D. Mass. 2004).[32] As Judge Weinstein, *Mehta's* author, observed:

> It is not at all uncommon in sentencing to put the crime in the context of the defendant's life. For example, courts enhance a sentence because the defendant's background reflects a life of crime and nothing else. *See, e.g*., U.S.S.G. § 4B1.3 (reliance upon criminal activity for a livelihood), or U.S.S.G. § 5H1.9 (same). With respect to extraordinary good works, the lens is the opposite—looking at the offense in the context of a lifetime of service.

*Id*. at 275.

Mr. Muhtorov's work in Uzbekistan on behalf of his fellow citizens is extraordinary. His history as an advocate for human rights in Uzbekistan, at great personal risk, is an example of the highest form of public service.[33]  When he was with Ezgulik, Uzbekistan was one of the world's most brutally repressive regimes.[34]  Mr. Muhtorov stood up to the regime on behalf of farmers whose lands were being expropriated.  And, when Karimov ordered the massacre of hundreds of peaceful protesters in the town of Andijan in May of 2005, Mr. Muhtorov spoke out. This led to him being first threatened and then beaten senseless by the Uzbek Secret Police. The danger was real enough to force him and his family to flee Uzbekistan.

---

[32] *Mehta* contains a through, and thoughtful, analysis of the guidelines, generally, and departures -- especially the "good works" departure -- specifically. *See also* Jack B. Weinstein, <u>A Trial Judge's Reflections on Departures from the Federal Sentencing Guidelines</u>, 5 Fed.Sent.R. 6, *5 (1992).

[33]  Michael Andersen testified that "Mr. Muhtorov was one of the more prominent and reputable human rights defenders in the country."

[34]  Steve Swerdlow of Human Rights Watch was asked at trial "[C]an you give us a sense of how Human Rights Watch, the U.S. State Department, the United Nations viewed the human rights record of the dictator, Karimov, during his time in power?" His answer: "In one word I would say atrocious."

Mr. Muhtorov's years of work with Ezgulik, the only registered human rights organization in Uzbekistan, on behalf of his oppressed and victimized fellow citizens, is well documented.  Given the environment in which it occurred and the danger to which it exposed him, it was "public service" of an exceptional sort and is a basis for a downward departure from the sentencing guidelines rage.

## SENTENCING FACTORS UNDER 18 U.S.C. § 3553

This section matters. Because, regardless of what "consulting" the non-binding guidelines tells us consultation means "calculate correctly." *United States v. Crawford*, 407 F.3d 1174, 1178 (11th Cir. 2005)), a sentence must be reasonable. Reasonable meaning "sufficient, but not greater than necessary, to comply with the purposes set forth in" 18 U.S.C. § 3553(a)(2), one of which is to "provide just punishment for the offense."  § 3553(a)(2)(A).

**(a)** **(1)** the nature and circumstances of the offense and the history and characteristics of the defendant

**History and characteristics of Mr. Muhtorov**

Mr. Muhtorov's personal history is discussed above.  It is summarized in this section.

Mr. Muhtorov is 42, a citizen of Uzbekistan. He has no criminal record. He is a husband and father. Until his arrest, he was a good provider. His wife, Nargiza Muhtorova, and he have three children together. The youngest of these was born after Mr. Muhtorov's arrest.

Mr. Muhtorov has been in jail (detention) more than six and one-half years.

When he was released on bail, the government appealed the Court's decision, and Mr. Muhtorov stayed behind bars.  While detained, Mr. Muhtorov has been unable to support his wife and children, financially or emotionally, and, until only recently, had no personal contact with them.  (The change was thanks to the Court.)

After arriving in America as a political refugee in 2007, and following brief stints as a janitor and meat packer, among other jobs, Mr. Muhtorov worked mostly as a long distance truck driver. Mrs. Muhtorova worked as a hotel maid. Together, the two provided a stable and secure home for their children. They also sent money home to Central Asia to family left behind there – in Uzbekistan, Kyrgyzstan, and Kazakhstan.

Before arriving in the United States, but for a hiatus while in exile in Kyrgyzstan, Mr. Muhtorov lived in Jizzak, Uzbekistan. His mother was an educator, his father, a surgeon. For the first fifteen years of life, Mr. Muhtorov lived under soviet rule. The Uzbek Soviet Socialist Republic imposed strict controls on freedom of expression and religion, control enforced by the KGB.

In 1991, the Soviet Union collapsed, and Uzbekistan became independent. Independence was in name only, as the soviet head of state, Islam Karimov, remained, now president for life. The new regime was more repressive than the communists were. Its abuse of its citizens – torture, imprisonment, repression of free expression and religion – made Uzbekistan a focus of attention for human rights organizations.

Jamshid Muhtorov graduated from high school in Jizzak and, after a year, went to university, from which he graduated. In 2001, he met and married Nargiza Muhtorova. That same year, he began working for Ezgulik, Uzbek for "compassion," the only state sanctioned human rights organization. He eventually became head of the regional branch in Jizzak.

Mr. Muhtorov's work with Ezgulik put him at odds with the government. The work involved defending the rights of farmers against the regime's land expropriation policies.

This changed after May of 2005 when Islam Karimov ordered the massacre of peaceful protesters in the Uzbek city of Andijan. Despite government efforts to cover up what happened, the international response was one of outrage.

In the immediate aftermath of the massacre, thousands of Uzbeks fled the country, many to neighboring Kyrgyzstan. Jamshid Muhtorov stayed. He did so even though the government cracked down – viciously – on any person who or organization that dared to publish the truth about the events in Andijan. Jamshid Muhtorov dared.  He spoke out despite threats and beatings by the Uzbek secret police.

In late 2005, Mr. Muhtorov was warned by fellow activists he was about to be arrested by the SNB, a regular occurrence.   Arrest by the SNB could, as documented, lead to the unspeakable.

Just ahead of the secret police, Mr. Muhtorov was smuggled out of Uzbekistan disguised as a woman, wearing a coat given to him by Elena Urlaeva, another well- known activist.

Mr. Muhtorov and his family first made their way to Osh, in neighboring Kyrgyzstan. But, even there they were not safe from the "long arm of the dictator." Kidnappings by the SNB were flagrant and frequent. They had to flee again, helped by a documentary filmmaker, this time to Bishkek, the Kyrgyz capital.  After rigorous vetting by the United States and the UNHCR, the family was granted political refugee status in 2007, admitted to the United States, and relocated to Denver, Colorado.

Mr. Muhtorov, free of government repression – of religious or political expression – took full advantage of this freedom. He regularly visited websites devoted to news about Central Asia and to opposition of the brutal dictator in his home country. He studied the tenets of Islam, the historical faith of his ancestors. He and his family regularly attended the local mosque.

In 2009, Mr. Muhtorov's brother, Asil Muhtorov, was admitted to the United States as a refugee. He, too, located to Denver, and, like his older brother, became a truck driver.

But one brother, Hurshid Muhtorov, remained behind. He fled Uzbekistan and settled in Kazakhstan. There, as Jamshid Muhtorov had been in Kyrgyzstan, he was in danger of being forcibly repatriated (kidnapped) by the SNB.

In 2011, Jamshid Muhtorov planned to travel to Central Asia. In January 2012, he parked his truck at his employer's office in Chicago and went to O'Hare Airport. He had with him $2800.00 cash, iPhones, an iPad, a one-way ticket to Istanbul, candy, small gifts, and dozens of documents related to getting refugee status for Hurshid. One was a blank refugee application form.  He never made it to his flight.

### **Nature and circumstances of the offense**

Mr. Muhtorov stands convicted of attempting and conspiring to provide material support to the I.J.U. The material support took two forms: money and himself.

Despite the one size fits all approach exemplified in Guideline § 3A1.4, no two "material support" cases are alike.  Looking at what Mr. Muhtorov actually did, or, better, tried to do, his offense conduct can fairly be said to fall more on the benign side of the spectrum of such cases.

In its Statement, the prosecution talks about Mr. Muhtorov's views, things he said, or watched. While others may find some of this offensive or even "repulsive," except insofar it may be relevant to sentencing, *e.g*., to the likelihood of recidivism, danger to the community, etc., the views are part of the marketplace of ideas in a free society.

Also, Mr. Muhtorov's opinions, in fairness, must be viewed through the lens of his own experience. For most of his life, he lived under a system that did not just discourage free expression, they brutally punished— and killed — those who criticized them or openly practiced their faith. Mr. Muhtorov spoke up for his fellow citizens, at great personal risk.

The lens through which Mr. Muhtorov viewed the world after he arrived in America was freedom. He was, for the first time, free to practice his faith. He could think, believe, and speak as he chose. He could express — openly, often — his opposition to the brutal dictator still in power in his homeland. He could cheer on, and communicate with, groups that opposed Islam Karimov.  And, in evaluating those opinions, it should be remembered that the person and the government he opposed were just plain horrible.  No decent human shed a tear when Islam Karimov passed away in 2016.

Those he encountered, including the prosecution's informant, have described Mr. Muhtorov as a blowhard, or worse. He was loud. He was windy. He had very strong opinions.

But, the "nature" of Mr. Muhtorov's offenses — of attempting/conspiring to provide material support to the I.J.U. — involved no actual violence, no plan to commit violence, and no intent to cause harm inside his adopted home, the United States. He was not someone with special combat skills, but a high school checkers champion who was never in the military.

Mr. Muhtorov's offense conduct was also marked by ineptitude. He was a flop at uploading videos. The most successful he was in helping the I.J.U. was when he forwarded links to satellite equipment sent him by the informant who himself got them from the FBI. Mr. Muhtorov never figured out how to get money to the I.J.U. When he tried to swear allegiance to the group, they ignored him. At the end of the investigation, headed for Istanbul

with suitcases full of candy, gifts, and documents, the terrorists he was supposedly supporting had written him off.

### The need for the sentence to reflect the seriousness of the offense

As the Court observed in the Memorandum Opinion in Mr. Jumaev's case, the offense of providing material support to international terrorist organizations is serious. So is seventy-nine plus months in jail. This is a long time for anyone to be locked up, especially a first offender.

In terms of reflecting the seriousness of the offenses here, they are not supporting terrorism in some abstract sense, but attempting to do so in the way the evidence described: An undelivered $300.00 and a wannabe recruit rejected by a nearly defunct group.

### Adequate deterrence

Assuming the deterrence is directed at Mr. Muhtorov, his likely future is not in the United States.  And before he ends up elsewhere, he will sit — perhaps for a long time — in immigration custody. Nothing more needs to be done to deter him.

If deterrence is directed to random "others" to dissuade them from providing material support, Mr. Muhtorov acknowledges and adopts the points made by the Court's reasoning in its Memorandum, Doc. 1920, pp. 28-29.

### Protecting the public

As was true for Mr. Jumaev, Mr. Muhtorov has no record. The Sentencing Commission's statistics reflect that persons with no criminal history are the least likely to recidivate.

At the risk of over-adopting the Court's opinion in Mr. Jumaev's sentencing, and recognizing that Mr. Muhtorov's case is different, Mr. Muhtorov agrees with the Court's response to the government's "trajectory" argument.  (It is unclear whether this trajectory notion

has any scientific basis, or is just one of many catch phrases, like "jihadi," "radicalization," "Islamic," de riguer in terrorism prosecutions.)[35]   In any event, the Court's comments, quoting Judge Hall in *United States v. Ahmad*, are apt:  "I cannot sentence . . . on an unfounded fear [a defendant] might do something." Doc. 1920, p. 30.

**Sentence disparities**

The Court has gathered and analyzed data about sentences in a large number of material support cases.  In some, the sentences are longer than what Mr. Muhtorov is asking for; in others, shorter.

But the sentencing statute talks in terms of the need to avoid *unwarranted* sentence disparities. 18 U.S.C.A. § 3553 (a) (6). Sentences imposed that consider the factors outlined in 18 U.S.C. § 3553(a), and are "sufficient, but not greater than necessary," are, by definition, warranted.

Looking at the examples the Court cited in its Memorandum Opinion, Doc.1920, pp. 33-39, and the chart attached, a sentence of time served for Mr. Muhtorov, to the extent it differs from these, is warranted. This is especially true when remembering that the 7 years and 7 months he has served is the equivalent of a sentence of 92 months reduced by good time.

---

[35]  "[A] thinly-sourced, reductionist view of how people become terrorists has gained unwarranted legitimacy." "[I]t is nearly impossible to predict who will move from espousing 'radical' views to committing violent acts." Faiza Patel, Rethinking Radicalization, Brennan Center for Justice (2011), pp. 1, 8. https://www.brennancenter.org/sites/default/files/legacy/RethinkingRadicalization.pdf (visited August 8, 2018)

To touch briefly on the cases the Court mentioned:

<u>Mohammed Jalloh.</u>

Received 132 months.

Attempted to buy an AK 47 assault rifle and was willing to support ISIS plots for attacks in the U.S. (Mr. Muhtorov never tried to buy a weapon, nor was he in possession of one. The U.S. Attorney conceded he was not planning attacks in the U.S.)

<u>Nicholas Young</u>

Received 180 months.

A former police officer who actually provided gift cards intended for ISIS. (Besides the obvious difference between a police officer and a private person, Mr. Muhtorov failed completely in getting financial support to the I.J.U.)

<u>Haris Qamar</u>

102 months.

Took photos of American sites for possible lone wolf ISIS attacks.  (Again, Mr. Muhtorov had no plan for attacks in the U.S.)

<u>Raja Khan</u>

90 months (about the same sentence with good time Mr. Muhtorov has served).

Met directly with terrorist group's leader in Pakistan and succeeded in providing money to him. (Mr. Muhtorov met with no one and provided money to no one.  He was shunned by the I.J.U.)

Basaaly Moalin

216 months.

Provided material support to al-Shabaab, and counseled them on how to bury bombs and munitions on his property. (Mr. Muhtorov actually provided nothing, and never engaged in conduct even remotely like bomb burying.)

Mohammed El-Mezain

180 months.

Funneled millions of dollars to Hamas.  (Mr. Muhtorov funneled nothing; not even the $300.00.)

Hindu Dhirane and Muna Jama

Ms. Dhirane, 132 months. Ms. Jama, 144 months.

Organized a group from many countries to fund al-Shabaab operations. Although the total was under $5,000.00, the judge found there was a substantial level of organization. (Mr. Muhtorov could not organize anything other than his trip to Turkey. He received $300.00 from Mr. Jumaev, after loaning him $500.00. No money made it to the I.J.U.)

Amina Esse

Ms. Esse cooperated against the others in the above group, and the prosecution recommended probation.

Amina Ali and Hawo Hassan

Ms. Ali, 240 months. Ms. Hassan, 120.

Actively solicited funds, even door to door, in the U.S. and Canada, falsely claiming the money was for the poor, when it was intended for al-Shabaab.  (Mr. Muhtorov did finally get Mr. Jumaev, through an intermediary, to repay him $300 of the $500.00 he had loaned him.

There is no evidence the money made it to the I.J.U., or that Mr. Muhtorov was even told how to get it to them.)

Nima Yusuf

96 months.

Actually mailed $1,450 to al-Shabaab fighters in Somalia. Tried to recruit local man to enlist as an al-Shabaab fighter.  (Mr. Muhtorov never sent money to the I.J.U., and recruited no one.)

Mohammud Yusuf

140 months

Sent $5,000.00 to al-Shabaab that they used to buy a fighting vehicle.  (Mr. Muhtorov sent money to no one in the I.J.U., so they could have bought nothing due to his efforts.)

Hor and Amera Akl

Mr. Akl, 75 months. Amera Akl, 40 months.

Their plan was to provide up to $500,000.00 to Hizballah. They tried to "launder" the money, $200,000.00 received from the FBI. (Mr. Muhtorov received $300.00 from Mr. Jumaev. His wife spent it on household items.)

Other cases

Aaron Daniels

Mr. Jumaev, among other examples, provided the Court with documents from the sentencing of Aaron Daniels. See Doc. 1917-1. Mr. Daniels received a sentence of 80 months. He admitted he was planning to join ISIL in Libya, and had sent one of their leaders $250.00. (Mr. Muhtorov actually sent nothing to the I.J.U.  He was not told how.  His pledge to the website was not accepted.)

41

<u>Burson Augustin and Rotschild Augustine</u>

Burson was sentenced to 72 months. Rotschild to 84 months.

06-cr -20373, Southern District Florida.  Conspiracy to provide and providing material support to Al Qaeda. The defendants were convicted after a jury trial. The probation office and prosecution, applying 3A1.4, sought a 30 year sentence.

<u>Abdirizak Warsame</u>

30 months, based on cooperating with government.

The charge was conspiracy to provide material support to ISIL.  Mr. Warsame joined a terrorist cell, the sole purpose of which was to provide material support to ISIL. Some of the group actually travelled to Syria and joined ISIL.  (Mr. Muhtorov was a member neither of a "cell" nor of a large conspiracy.  He did not join the I.J.U., but was spurned by them.  He did not cooperate against Mr. Jumaev, so the prosecution is asking for 30 years. )

The Court's chart, appended to the Jumaev Memorandum Opinion, contains many examples — some discussed above — of sentences in material support cases that are less, sometimes far less, than the time Mr. Muhtorov has actually served.  An even greater number are shorter than 92 months, the equivalent of the time he has served when that sentence is reduced for good time.  *See* Doc. 1920-1, pp. 10-12. Without going through each example, none appears to involve offense conduct less serious than Mr. Muhtorov's does.

And, whether the Court considers him to be the least of the least, as it did Mr. Jumaev, Jamshid Muhtorov is not among the worst of the worst, as the government's thirty year request implies.

**The kinds of sentences available**

The Court could, in theory sentence Mr. Muhtorov to 45 years. Three counts. Fifteen years maximum each.

Like Mr. Jumaev, Mr. Muhtorov faces deportation proceedings. Doc. 1929, PSR first disclosure, p. 2, "Detainers." His future is, even with a time served sentence, uncertain.

As deporting Mr. Muhtorov to Uzbekistan could be deporting him to his death, there is a significant likelihood of protracted immigration proceedings (with little likelihood of a bond) that will focus on preventing his deportation to Uzbekistan, a process called withholding of removal.   That process and the perils of being returned to Uzbekistan are described in a case the Court cited  in its Memorandum Opinion, *Yusupov v. Attorney Gen. of U.S.*, 650 F.3d 968 (3d Cir. 2011).

**Providing needed educational or vocational training, medical care, or other correctional treatment in the most effective manner 18 U.S.C.A. § 3553(a)(2)**

Sentencing Mr. Muhtorov to more than time served to help in his treatment, education, etc., runs afoul of the Supreme Court's decision in *Tapia v. United States,* 564 U.S. 319, 337 (2011). More important, as the Court noted in it Memorandum Opinion, there are no programs in prison that focus on rehabilitating persons convicted of terrorism offenses. *Id.*, Doc. 1920, p. 31, note 1.

**Conclusion**

A sentence of time served, the functional equivalent of 92 months, is sufficient but not greater than necessary to achieve the goals, or objectives, of 18 U.S.C. § 3553. It is consistent with the "parsimony principle," a broad command to impose a sentence sufficient, but not greater than necessary, to comply with the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation. *Dean v. United States*, 137 S. Ct. 1170, 1175, 197 L. Ed. 2d 490 (2017).

The terrorism enhancement has no place in Mr. Muhtorov's sentencing. Nor does the prosecution's request for thirty years.

As George D. Brown put it, "[The Terrorism Enhancement does not reflect] an important value of the criminal law: the gradation of offenses. We do not treat a purse-snatcher like a rapist." *Notes on a Terrorism Trial--Preventive Prosecution, "Material Support" and the Role of the Judge After United States v. Mehanna,* 4 Harv. Nat'l Security J. 1, 54 (2012).

Both the terrorism guidelines and the prosecution's request for 30 years treat Mr. Muhtorov's "purse snatching" as rape. Both ignore the realities of the case and the history and characteristics of the person. Both adopt the view that "a terrorist is a terrorist." *Id*. Neither is "based on rational thought, humanity, or compassion."

Jamshid Muhtorov has now served the equivalent of a 92 months federal prison term.

He has done so in a jail.  Before his arrest, he had no record, except for his record of

extraordinary public service as an advocate for human rights in Uzbekistan, a brutally repressive

dictatorship.  His future is uncertain.  Whatever it is, it should not include more time in prison.

Respectfully submitted,

VIRGINIA L. GRADY
Federal Public Defender


/s/ Warren R. Williamson
WARREN R. WILLIAMSON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email: rick.williamson@fd.org
Attorney for Defendant

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2018, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following email addresses:

**Gregory Allen Holloway**
Email:  Gregory.Holloway@usdoj.gov

**David Alan Tonini**
Email:  David.Tonini@usdoj.gov

**Beth Gibson**
Email:  Beth.Gibson@usdoj.gov

**Julia K. Martinez**
Email:  Julia.Martinez@usdoj.gov

**Kathryn J. Stimson**
Email:  kstimson@hmflaw.com

**Brian Rowland Leedy**
Email:  bleedy@hmflaw.com

**Patrick C. Toomey**
Email:  ptoomey@aclu.org

**Jacob R. Rasch-Chabot**
Email:  Jacob_Rasch-Chabot@fd.org

**David Barry Savitz**
Email:  savmaster@aol.com

**Mitchell Baker**
Email:  mitchbaker@estreet.com

**Emily Boehme**
Email:  emboehme@gmail.com

and I hereby certify that I have mailed or served the document or paper to the following non CM/ECF participant in the manner (mail, hand-delivery, etc.) indicated by the non-participant's name:

Michelle D. Means, U.S. Probation officer
Email:  michelle.means@cod.uscourts.gov

Jamshid Muhtorov
via mail

/s/ Warren R. Williamson
WARREN R. WILLIAMSON
Assistant Federal Public Defender
633 17th Street, Suite 1000
Denver, CO  80202
Telephone:  (303) 294-7002
FAX:  (303) 294-1192
Email: rick.williamson@fd.org
Attorney for Defendant