IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 12-cr-00033-JLK

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    JAMSHID MUHTOROV,

    Defendant.

---

**ORDER DENYING DEFENDANT MUHTOROV'S MOTION TO SET
ASIDE VERDICT AND FOR A NEW TRIAL (ECF NO. 1924)**

---

Kane, J.

As they were leaving the courthouse on June 14, 2018, some jurors in Defendant Jamshid Muhtorov's trial believed that Mr. Muhtorov's wife, who had testified in the trial, was taking pictures of them with her cell phone from across the street. The jurors were on their second full day of deliberations and had decided that afternoon that they would recess until the following Monday. Upon seeing Mrs. Muhtorov, a few jurors returned to the foyer and reported their belief to the Court Security Officers (CSOs). Another group of jurors that had walked a different route was called by the first group of jurors and advised to stay within view of the courthouse. The U.S. Marshals were notified and rushed to investigate the matter. The Marshals determined that neither Mrs. Muhtorov nor Ms. Kallenberg, the family friend who was with her and who had also testified in the trial, had any photos or videos of the jurors on their cell phones. This conclusion was not relayed to all of the jurors that afternoon. But, with my approval and following routine practice, the Marshals escorted some of the jurors to their vehicles.

1

The following day, I held a hearing to discuss the incident with counsel and suggested a corrective instruction to be given to the jurors. Mr. Muhtorov's counsel requested instead to interview the involved CSOs and Marshals over the weekend. Mr. Muhtorov then filed a motion for an evidentiary hearing on the matter, which I granted. The CSOs and Marshals as well as Mrs. Muhtorov and Ms. Kallenberg were called in first thing Monday morning to testify.

When the jurors began arriving to the jury room that morning, they were told not to discuss the incident that had happened on Friday. It seems some had already been recounting it to their fellow jurors. Some may also have continued to do so even after they were directed not to. One had a family emergency that morning, so only 11 jurors were present. As a result, an alternate juror was brought in mid-morning to replace the absent juror, and the jury was instructed to begin its deliberations from scratch with the new juror.

At the conclusion of the evidentiary hearing, I determined it was necessary to interview each juror individually in chambers regarding his or her ability to be fair and impartial and to decide the case on only the evidence presented at trial and the law as it was given to them. All of the jurors unequivocally confirmed that they could do so despite the happenings on June 14, 2018. Nevertheless, Mr. Muhtorov orally moved for a mistrial or, in the alternative, replacement of three of the jurors who he believed exhibited the most bias and were the most impacted by the incident. I denied the motion from the bench, concluding the jurors had "demonstrated a willingness to be fair and impartial jurors." 06/18/18 Tr. at 175:1. I specifically noted that "the question of whether they have the capacity to do that or not seems to me to be very well established by the fact that they have answered honestly and candidly as to the other matters." *Id.* at 175:2-5.

Three days later, the jury returned its verdicts, finding Mr. Muhtorov guilty of the first three counts charged against him and not guilty of the fourth. I polled each of the jurors on the

verdicts and each unequivocally confirmed that he or she considered only the evidence presented during the trial and that he or she followed the instructions of law that I had given to them, and nothing else.

Mr. Muhtorov now moves to set aside those verdicts and for a new trial (ECF No. 1924) for what he articulates as two reasons. First, he asserts that the jurors were exposed to extraneous information during their deliberations, which denied him a right to a fair trial by an impartial jury. Second, he claims that, on the morning of Monday, June 18, fewer than twelve jurors deliberated without judicial approval or his consent. I see a third argument tied up in his first—that the jurors' reactions to his wife standing on the street with her cell phone demonstrated their inability to be impartial.

I am sympathetic to and do not take lightly Mr. Muhtorov's impression that the jurors made assumptions about his wife, and ultimately him, based on his religion, race, national origin, or other inappropriate and irrelevant factors. Nevertheless, I find Mr. Muhtorov's arguments to be misplaced and the government's Response (ECF No. 1947) to the Motion to be wholly persuasive.[1] So I deny the Motion.

I. Legal Standard

Federal Rule of Criminal Procedure 33 permits me to "vacate any judgment and grant a new trial if the interest of justice so requires." The Sixth Amendment to the U.S. Constitution guarantees a defendant the right to a fair trial by an impartial jury. Included in the right to an impartial jury is that the jury be "capable and willing to decide the case solely on the evidence before it." *United States v. Brooks*, 569 F.3d 1284, 1288 (10th Cir. 2009) (citation and internal

---

[1] Mr. Muhtorov was entitled to submit a reply on or before August 9, 2018 (see ECF No. 1913) but did not do so.

quotation marks omitted). The test of juror impartiality is whether "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961) (citations omitted). "When a juror's bias against a defendant affects the juror's evaluation of trial evidence, the bias violates the defendant's constitutional right to a fair trial." *Id.* "The requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of a trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965).

Federal Rule of Criminal Procedure 23 specifies that the impartial jury is to consist of 12 jurors unless the parties stipulate to a smaller jury or the court permits a jury of 11 to return the verdict. My final instructions to the jurors on June 12, 2018, included an advisement that all of the jurors must be present during any deliberations. *See* Trial Tr. at 1411:14-19, ECF No. 1943.

II. The June 14 Incident

Under his first reason for requesting a new trial, Mr. Muhtorov takes issue not just with the impact the June 14 incident had on the jurors, but also with the assumptions made by the jurors.[2] Mr. Muhtorov lumps the initial reaction of the jurors to Mrs. Muhtorov together with the lasting influence the incident had on them, but I find these two aspects must be evaluated separately. The former is really a question of whether certain jurors demonstrated that their biases were so great that they could not be fair and impartial, while the latter is a question of whether the incident so impacted the jurors that they could no longer adhere to the instructions and their oath.

---

[2]*See* Mot. at 2 ("The reaction of the individual jurors . . . reflects three things: First, an assumption on jurors' parts that Mrs. Muhtorova, a Muslim woman, would—for some reason—be taking their pictures. Second, this assumption was grounded in fear . . . . That some jurors assumed Mrs. Muhtorova would photograph them—and discussed this with their fellow jurors—should have resulted in a mistrial.").

4

A. Juror Partiality

"Where a defendant seeks a new trial based on juror bias but does not allege that the juror intentionally gave a false statement during voir dire, the defendant bears the burden of demonstrating actual bias or, in exceptional circumstances that the facts are such that bias may be inferred." *United States v. Reed*, 12 Fed. App'x 880, 882 (10th Cir. 2001) (unpublished) (citing *Gonzales v. Thomas*, 99 F.3d 978, 985-86 (10th Cir. 1996)). "And even where juror bias is shown, not every incident requires a new trial. The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial." *United States v. Jones*, 707 F.2d 1169, 1173 (10th Cir. 1983) (internal quotation marks and citation omitted).

First, to be clear: The jurors were wrong in their assumptions about what Mrs. Muhtorov was doing standing across the street from the courthouse. Mrs. Muhtorov and Ms. Kallenberg were within their rights and admirably cooperated with the Marshals. I could speculate as to why the events unfolded as they did.[3] But determining why exactly the jurors were wrong is unnecessary, unless it impacted the verdicts in this case. I am certain it did not. The jurors were repeatedly instructed to base their decisions on only the evidence presented at trial and not any preconceived notions or fears. They each confirmed that they could do so on multiple occasions and, after the verdicts were returned, they affirmed that they had done so. Moreover, their deliberations and verdicts reflect those of an impartial jury.

---

[3]Perhaps it was due to the stress experienced when one has another's fate in his or her hands. Or maybe the nature of the evidence in the trial placed the jurors on high alert. It also could have been trigged by the outburst of Mr. Muhtorov's brother during closing arguments. Others may have been swept up into the incident out of pure emotion or groupthink.

*Repeated Instructions to the Jury*

During *voir dire*, on both May 14, 2018, and May 17, 2018, I instructed the prospective jurors on the difference between having bias and being impartial,[4] and I emphasized that the essential "requirement for a fair trial is that the jury decide the case based only on the evidence and the law presented at trial, and only the evidence and law presented at trial." I went on to stress the importance of their honesty and the oath that they took, and I explained that we were "trying to find jurors who regardless of what they have seen or heard, and even regardless of what they have thought or said, can understand that their job as jurors is to decide this case based only on the evidence presented here in court and to apply only the law as I explain it."

Then, after the jury was impaneled, I instructed the jury in Mr. Muhtorov's trial as I always do—before, during, and after the presentation of evidence. The instructions I gave contain at least five separate admonitions that the jury must confine its decisions to the evidence presented at the trial. *See*, *e.g.*, Instruction No. 1 ("You are to consider all the evidence received in this trial and only the evidence received at trial . . . . The reason for this is that your decision in this case must be made solely on the evidence presented at the trial."); Instruction No. 3 ("It is also your duty to base your verdicts only on the evidence, without prejudice or sympathy. That is the promise you make and the oath you take."); Instruction No. 5 ("You must make your decision based only on the evidence that you see and hear in court. Do not let rumors, guesses, or anything else that you may have seen or heard outside of court influence your decision in any

---

[4] I described the concepts, stating: "Being impartial means treating or affecting all equally; bias, on the other hand, is an inclination of temperament or outlook. A person is biased if they start out knowing what they're going to do before they hear anything. Everyone has some degree of bias; they hear something and immediately have a mental reaction to it. But someone can still be impartial if they don't allow their biases to determine the result, and, instead, say to themselves, wait a minute, I have to hear this."

way."); Instruction No. 6 ("While you must consider only the evidence in this case . . . ."). This means that, before the June 14 incident occurred, the jurors had already been instructed at least eight times not to permit any bias or outside experience to influence their decisions.

As I interviewed each juror after the incident, I again reminded them of their duty to render verdicts based on the evidence alone and directed them to disregard anything else. I also informed them of their obligation to make sure that the other jurors complied with that instruction as well. "The assumption that juries can and will follow the instructions they are given is fundamental to our system of justice." *United States v. Cardall*, 885 F.2d 656, 668 (10th Cir. 1989). There is no indication here that the jury did not do so.

*Jurors' Confirmations*

Indeed, each juror confirmed on two occasions—during an extraordinary hearing and after verdicts were tendered—that he or she did not consider any matters outside of the admitted evidence and the instructions of law.[5] The Tenth Circuit has recognized that district judges are "in the best position to judge . . . the sincerity of the jurors' pledge to abide by the court's instruction." *United States v. Wacker*, 72 F.3d 1453, 1466-67 (10th Cir. 1995) (citing *United States v. Gibbons*, 607 F.2d 1320, 1330-31 (10th Cir. 1979); *United States v. Tegzes*, 715 F.2d 505, 508-09 (11th Cir. 1983)). Just as I found in ruling on the motion for a mistrial, the jurors' honesty in all matters leads me to conclude that their pledges were sincere. That a couple of jurors maintained that they would prefer that Mrs. Muhtorov and Ms. Kallenberg, both witnesses in the case, not stand in front of the courthouse in no way establishes that their pledges were

---

[5]Many of the jurors responded that they "absolutely" could judge the case solely on the evidence presented at trial and the law as it was given to them. *See* 06/18/18 Tr. 95:11-13 (Juror No. 497), 115:23 (Juror No. 47), 150:6 (Juror No. 408). Others emphasized that they "absolutely" could treat Mr. Muhtorov equally and fairly despite his race. *See id.* at 156:13 (Juror No. 141), 133:8 (Juror No. 733), 138:24-139:1 (Juror No. 823).

7

unreliable. Again, the jurors could have indicated that preference for a variety of reasons, including to save face after realizing the wrongness of their assumptions. I need not speculate because those inclinations did not impact the verdicts.

*The Juror Notes and Verdicts*

The jury's notes to the Court during its deliberations, the length of its deliberations, and its resulting verdicts underscore the reliability of each juror's statements that he or she could and did impartially decide the verdicts. On June 20, 2018, the jury wrote a note requesting a stress ball or a light projectile. Jury Question 2 at 1, ECF No. 1896-1. The following day, the jurors first asked for a definition of "communications equipment and services," Jury Question 3 at 1, ECF No. 1897-1, and then advised that a defense exhibit was missing from their notebooks, Jury Question 4 at 1, ECF No. 1897-1. Lastly, right before they rendered their verdicts, they sought a copy of the oath they took as jurors. Jury Question 5 at 1, ECF No. 1897-2. These are the notes of a jury working through challenging questions, considering each complex term of the elemental instructions, and committed to fulfilling its duty. Tellingly, there were no notes claiming that other jurors were not following the instructions given to them or that they were considering inappropriate matters. *Cf. United States v. Pennell*, 737 F.2d 521, 529 (6th Cir. 1984) (noting that two jurors described a third juror as apprehensive and nervous after receiving a threatening phone call, but still finding that the district court did not abuse its discretion in relying on the third juror's self-evaluation that she could remain impartial).

The jurors deliberated for three days after my individual interviews with them, eventually acquitting Mr. Muhtorov of the count against him involving "communications equipment or services." The fact that they took three additional days supports the conclusion that they abided by the instructions, including the direction to start from zero with the alternate, and that they

8

reviewed all of the evidence and the legal standards. The verdict of acquittal is the last piece of the puzzle—clear proof that the verdicts were based on merit and due consideration. There simply is no reason to believe that the verdicts were the product of bias or inappropriate influence.

B. Exposure to Extraneous Information

Preliminarily, with regard to the jury's alleged exposure to extraneous information, I must agree with the government that Mrs. Muhtorov standing on the street with her cellphone does not qualify. No words were exchanged, and in fact, Mrs. Muhtorov did not intend to communicate anything to the jurors. There was no attempt to tamper with the jurors by anyone nor was any information conveyed to them. As I explained in my Preliminary Order (ECF No. 1827) on Mr. Jumaev's motion to set aside the verdicts in his trial:

> [W]hen a jury considers facts that have not been introduced in evidence, a defendant has effectively lost the rights of confrontation, cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous evidence . . . It is impossible to offer evidence to rebut it, to offer a curative instruction, to discuss its significance in argument to the jury, or to take other tactical steps that might ameliorate its impact.

*Gibson v. Clanon*, 633 F.2d 851, 854 (9th Cir. 1980). Here, the concern is not that Mr. Muhtorov lost his rights of confrontation, cross-examination, or the assistance of counsel or that he was unable to offer evidence to rebut the jurors' assumptions or to offer a curative instruction.[6]

Even if I assume that the jury was exposed to some sort of extraneous information, though, the outcome is the same. The Tenth Circuit has "developed two different standards by which a trial judge is to assess the impact of exposure to extraneous material on a jury." *Smith v. Ingersoll-Rand Company*, 214 F.3d 1235, 1241 (10th Cir. 2000); *see also United States v.*

---

[6]Furthermore, as the Supreme Court expressed in *Remmer v. United States*, "it is the law's objective to guard jealously the sanctity of the jury's right to operate as freely as possible from outside unauthorized intrusions *purposefully* made." 350 U.S. 377 (1956) (emphasis added). Here, there was no purposeful intrusion.

9

*Schwartz*, 702 Fed. App'x 748, 753 (10th Cir. 2017) (unpublished). "In one vein of [the] case law, [it] has held jury exposure to extrinsic material warrants a new trial if there is the 'slightest possibility' the exposure affected the verdict . . . . In a second vein, [it has] held jury exposure to extraneous information creates a 'presumption of prejudice' which may be rebutted by showing the exposure was harmless." *Smith*, 214 F.3d at 1241.[7] Under either standard, Mr. Muhtorov's Motion fails. There is no possibility that the incident affected the verdicts, and the government has shown that any exposure of the jury to extraneous information was harmless.

In addition to all of the above reasons for why there undoubtedly was no impact on the verdicts, it is significant that the jury was informed that nothing had happened—that Mrs. Muhtorov had not been taking pictures of them or doing anything improper. Upon hearing the explanation, jurors acknowledged that the incident became a non-issue. For example, Juror No. 141 felt "ashamed and embarrassed" about the misunderstanding, 06/18/18 Tr. at 156:1-3, Juror No. 823 was not affected once she knew that what the jurors thought had happened did not, *id.* at 138:6-7, Juror No. 361 was helped by hearing the "back story," *id.* at 144:14-17, and Juror No. 408 was no longer scared, *id.* at 150:11-13. If any juror was still so disturbed by the incident or overwhelmed by fear, all he or she needed to say was that he or she could not continue on. Yet not one hinted at experiencing that sentiment. Under these circumstances, I see no reason why a juror would be dishonest as to the impact of such an incident on him or her, especially when the deliberations were already starting anew due to the use of the alternate. The fact that the jurors'

---

[7]Additionally, the Tenth Circuit has acknowledged that the presumption of prejudice is qualified "by requiring a contact that was about the matter pending before the jury." *United States v. Robertson*, 473 F.3d 1289, 1294 (10th Cir. 2007) (internal quotation marks and citation omitted). And "[t]he defendant must also demonstrate that an unauthorized contact created actual juror bias; courts should not presume that a contact was prejudicial. Otherwise, a *Remmer* hearing would be required based on each of the multiple ordinary incidental contacts between non-sequestered jurors and virtually any other person during the course of a trial." *Id.* (internal quotation marks and citations omitted).

notes indicated they might be under stress is unsurprising, but it is more likely a result of their honest consideration of each count and the verdicts rendered than any external influence. In sum, neither were the jurors partial nor were they exposed to extraneous information such that their verdicts were impacted.

III. The June 18 Discussions by Fewer than 12 Jurors

On June 18, when the jurors returned to the courthouse for the first time after the June 14 incident, those present began to discuss what had happened. Mr. Muhtorov classifies these discussions as deliberations and contends that, because he did not consent to a jury of fewer than 12, he is entitled to a new trial.

First, as pointed out by the government, these discussions were not deliberations. Black's Law Dictionary defines deliberation "as the act of carefully considering issues and options before making a decision or taking some action," especially "the process by which a jury reaches a verdict, as by analyzing, discussing, and weighing the evidence." Black's Law Dictionary 520 (10th ed. 2014). The incident was not evidence, which was well-known to the jurors after repeated instruction. So the jurors were not analyzing, discussing, or weighing the evidence, i.e., they were not deliberating.

Mr. Muhtorov argues that I acknowledged during the June 18 interviews of the jurors that their discussions about the June 14 incident were deliberations.[8] He is incorrect. I stated that the jurors' tales about Mrs. Muhtorov and Ms. Kallenberg related to the deliberative process since both women were witnesses; I specifically did not state that they constituted deliberations.

---

[8]Mot. at 18 n. 24 ("This early morning discussion among the eleven jurors was considered part of the deliberations. When asked by defense counsel to inquire of the jurors what they discussed 'about Mrs. Muhtorova and Ms. Kallenberg,' the Court responded, 'I'm not going to do that, and I'll tell you why. Because that relates to the deliberative process, how much credibility they give them.' [06/18/18 Tr. at 106:15-107:7].").

Asking the jurors open endedly "what they discussed" could have invited their opinions on the women's credibility and testimony.

Regardless, pursuant to order, the jury began its deliberations *de novo* when the alternate was called in **after** the eleven jurors had allegedly deliberated. The new set of jurors started from scratch, so any previous discussions had no impact on the verdict. Mr. Muhtorov does not attempt to show any prejudice resulting from the jurors' discussions and would be unable to do so. His second reason for requesting a new trial is thus without merit.

## IV. Conclusion

Mr. Muhtorov is guaranteed a fair trial, not a perfect one. *Bruton v. United States*, 391 U.S. 123, 134 (1968) (quoting *Lutwak v. United States*, 344 U.S. 604, 619 (1953)). All involved, in particular Mr. Muhtorov's counsel, have endeavored to the greatest extent possible to ensure that he have such a trial. Such efforts are respected and appreciated. I find that Mr. Muhtorov was provided a fair trial by an impartial jury in this case. His Motion (ECF No. 1924) is, therefore, DENIED.

DATED this 10th day of August, 2018.

_____
JOHN L. KANE
SENIOR U.S. DISTRICT JUDGE