**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 12-cr-00033-JLK

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.     JAMSHID MUHTOROV,

      Defendant.

---

**MEMORANDUM OPINION AND SENTENCING ORDER**

---

Kane, J.

    On January 21, 2012, Defendant Jamshid Muhtorov was arrested at O'Hare Airport in Chicago as he attempted to board a flight to Istanbul, Turkey, with a one-way ticket. In his possession were $2,865 in cash, two new iPhones, a new iPad, and his personal cellphone containing numerous terrorist propaganda videos. The government had previously intercepted statements by Muhtorov that he intended to travel to the "wedding" or the "wedding house" from Turkey and that he desired to support the Islamic Jihad Union (IJU), a designated foreign terrorist organization. From his intercepted conversations, it is apparent that Muhtorov frequently used the word "wedding" in association with violent jihad and in relation to the activities of the IJU.

    On June 21, 2018, a jury found Muhtorov guilty of three counts of providing material support to a foreign terrorist organization under 18 U.S.C. § 2339B, namely (1) conspiring and (2) attempting to provide $300 to the IJU, and (3) providing or attempting to provide himself as

personnel to that same organization. The jury acquitted Muhtorov of a fourth material support count—attempting to provide communications equipment and services to the IJU.

Muhtorov's codefendant, Bakhtiyor Jumaev, was also found guilty of (1) conspiring and (2) attempting to provide material support in the form of $300 to the IJU. A little over a month ago, I sentenced Jumaev to the 76 months and 3 days he had already spent in detention. *See United States v. Jumaev*, No. 12-cr-00033-JLK, 2018 WL 3490886, at *21 (D. Colo. Jul. 18, 2018). In doing so, I stressed that Jumaev's conduct placed him among the least culpable offenders who have been convicted under the material support statute. *See id.* That is not the case with Muhtorov, however. Muhtorov was calculated and at times devious. He encouraged others, including Jumaev, to support the IJU and terrorist ideals generally. He also swore his allegiance to the IJU and told his daughter to pray that he become a martyr. Still, Muhtorov's actions do not come close to the severity of those of the most culpable offenders. Like Jumaev, he did not plot to commit specific acts of violence, nor did he engage in planning acts of violence in the United States. Nor does the evidence reveal any concrete path known to or established by Muhtorov to achieve his intended goal of supporting the IJU. Indeed, he was a self-described braggart who craved attention and admiration from others, making the resoluteness of his actions and intentions questionable.

In examining Muhtorov's individual circumstances and reaching the conclusions detailed below, I have considered the initial and revised Presentence Investigation Reports (ECF Nos. 1929 and 1957) and Muhtorov's Objections (ECF No. 1951) and the Addendum (ECF No. 1958) to the Report. I have reviewed as well the government's Amended Sentencing Statement (ECF Nos. 1944-1, 1944-2), Muhtorov's Sentencing Statement (ECF No. 1949), his Supplement thereto (ECF No. 1950), his Memorandum Regarding Sentencing Guidelines (ECF No. 1918), his Motion for Variant Sentence and Downward Departure (ECF No. 1955), the letter from him

filed as a Supplement thereto (ECF No. 1956-1), and the government's eleventh-hour Response to Muhtorov's filings (ECF No. 1961) that I have stricken. Before deciding the appropriate sentence, I have also listened to and reflected on the statements of the prosecution and defense counsel and Muhtorov's allocution.

I.

BACKGROUND

Muhtorov was born in 1976 in Jizzakh, Uzbekistan, which at that time was part of the Soviet Union. His mother was a teacher and his father a surgeon. He was the eldest of five siblings—three boys and two girls.

In 1991, when Muhtorov was about 15, the Soviet Union collapsed, and Islam Karimov became the President of Uzbekistan. Steven Swerdlow, an expert on the human rights history of Uzbekistan, described the country's human rights record under Karimov as "atrocious" and "abysmal," commenting that it was "by far one of the worst and most repressive situations of human rights on earth." Trial Tr. at 1429:6-12. During this time, the Uzbek government stamped out free expression, imprisoned thousands of people on false charges, and tortured detainees. *Id.* at 1429:21-1431:14. Uzbekistan further promulgated some of the world's most restrictive laws on religion, under which individuals were forced to practice their religion within the strict confines required by the Uzbek government. *Id.* at 1437:3-13.

Under these circumstances, Tohir Yuldashev and Juma Namangani formed the Islamic Movement of Uzbekistan (IMU) with the purpose of toppling Islam Karimov's regime. Trial Tr. at 168:5-25. The Islamic Jihad Union, the organization Muhtorov sought to support, splintered from the IMU in late 2001 or early 2002, seeking to focus its efforts globally instead of on Uzbekistan alone. Trial Tr. at 161:20-21, 167:11-13. The IJU has been affiliated with al-Qaeda

and the Taliban and has fought U.S. and coalition forces in Afghanistan. Trial Tr. at 162:14-17, 163:1-5, 169:12-19. In its heyday around 2006, the organization had about 100 to 200 members, but its numbers dwindled substantially after that time. Trial Tr. at 202:17-19, 203:13-16.

Muhtorov went on to attend a polytechnical university and to graduate with a degree in construction engineering. In 2001, he married his wife Nargiza and went to work for the Uzbek human rights organization Ezgulik. As a human rights advocate, Muhtorov fought to protect farmers' rights, appearing in court and meeting with representatives from various non-governmental organizations and foreign embassies.

On May 13, 2005, in the Uzbek city of Andijan, government troops opened fire on a peaceful protest. It is estimated that between 700 and 1,000 people were killed at what has become known as the "Andijan Massacre". Afterwards, Muhtorov publicized reports from the incident and spoke out in opposition to the Uzbek government's actions. As a result of this advocacy, he was beaten on two occasions. The second time, in November 2005, his nose was broken and he lost consciousness. Muhtorov's family paid a hefty price for his work as well. His mother and his brother, Hurshid, were terminated from their jobs, and his sister and father were arrested.

Eventually, Muhtorov believed the threat from the Uzbek government was serious enough that he fled to Kyrgyzstan. His wife and two children joined him there. During the months he lived in Kyrgyztan, Muhtorov began researching the various sects of Islam, including the Hizb ut-Tahrir, Tabligh, and Akromiya sects. He continued his inquiry in the years that followed, studying the Salafi sect and ultimately embracing his curiosity about terrorist sects. He had never been permitted to explore such interests in Uzbekistan.

While in Kyrgyzstan, Muhtorov and his family applied for and were granted admission to the United States as political refugees. In February 2007, they moved to Denver, Colorado,

where he found employment first as a janitor in a casino and then in a meat packing plant. In search of a better-paying job, he decided to obtain his commercial truck driver's license, which led him to meet Jumaev. In December 2009, a friend of Muhtorov arranged for him to stay in Jumaev's apartment in Philadelphia, Pennsylvania, while he studied to take his commercial license exam.

Jumaev and Muhtorov had similar backgrounds. Both were from Uzbekistan and had come to the United States after experiencing brutality at the hands of the Uzbek authorities. Over the months that passed after Muhtorov returned home, they developed a long-distance friendship in which they discussed a wide variety of topics, including their families, Islam, current events, and the immigrant experience in the U.S. They also conversed about the IJU and the IMU, the history of those terrorist organizations, and related propaganda videos they found online. In speaking about these organizations, they often used ambiguous code words, like wedding, resort, Switzerland, alpinists, and sportsmen. Muhtorov also took the precaution of employing anonymizers[1] to access terrorism-related websites and instructed Jumaev how to do the same. Gov't Trial Ex. 19A at 3-7.

From 2009 to his arrest in this case, Muhtorov communicated over the internet with the website administrator for Sodiqlar.com, the the IJU's website. Trial Tr. at 1250:4-7. Muhtorov developed such a relationship with the website administrator that he sent pictures of his young children and of himself with a beard. Gov't Trial Exs. 111A at 1, 116A at 1, 116B at 1, 530 at 1, 530A at 1.

In February 2010, Jumaev was detained by U.S. Department of Homeland Security Immigration and Customs Enforcement (ICE) for overstaying his visa. Jumaev borrowed money

_____

[1]Anonymizers are tools that are utilized to mask the location of the user when accessing websites. Trial Tr. at 342:7-20.

from friends and acquaintances to pay his bond, including $500 from Muhtorov. After his arrest, Jumaev struggled to manage his and his family's debts, so he did not pay Muhtorov back for many months.

Muhtorov repeatedly hinted to Jumaev about his need to at least partially repay the loan. By March 2011, Muhtorov informed the IJU that "Abu Bakr," Jumaev's moniker, had promised to send him $300 for the organization. Gov't Trial Ex. 107A at 2. Muhtorov then relayed to Jumaev that the IJU had written him that it was in dire need of financial support. Gov't Trial Ex. 125A at 2. Jumaev gathered $300 and used a friend's check to send the money to Muhtorov. After a few days passed, Jumaev pressed Muhtorov on whether he had received the "wedding gift." Gov't Trial Ex. 128A at 1. Shortly after, the check was delivered.

Although Muhtorov's wife spent the $300 from Jumaev on their family's expenses, Muhtorov continued to tell others about Jumaev's "wedding gift" for the IJU. Muhtorov informed the website administrator for the IJU that a brother had sent him a $300 "wedding gift" and asked what he should do with it. Gov't Trial Ex. 112A at 1. Similarly, he told a Confidential Human Source for the FBI that a brother had sent him $300 for the IJU, but the IJU would not tell him how to get the money to it. Gov't Trial Ex. 157A at 7.

Soon after receiving Jumaev's check, Muhtorov emailed the IJU website administrator an oath of allegiance stating that he would perform any task for the organization even if it meant risking death. Gov't Trial Ex. 107A at 1.[2] The evidence shows that the IJU only ever requested that he upload and distribute terrorist propaganda materials and help them to acquire satellite

---

[2]Muhtorov wrote: "[Y]our humble servant intends to take an oath of allegiance. Today, I rehearse the oath exactly as it was delivered by companions of our Prophet. I would like to request you, my dear brother, witness and entrust you with delivering this humble servant's oath to the emir. The name passed to this humble servant by his parents is Jamshid Muhtorov. [I am] from Uzbekistan, Jizzakh province. My true name is Abumumin Turkistoniy. Now I am ready for any task, even if it means the risk of death. Whom should I send the wedding gift to?" Gov't Trial Ex. 107A at 1.

internet equipment. Gov't Trial Exs. 100A at 2, 101A at 1, 105A at 2, 109A at 1-3, 118A at 1, 124A at 1. Instead of carrying out the assignments himself, Muhtorov sought assistance from the FBI Confidential Human Source. Gov't Trial Exs. 121A at 1, 157A at 2-11, 158A at 2, 162A at 16-22, 167A at 13-14.

Muhtorov frequently sent money to his parents and his brother Hurshid, who was in Kazakhstan attempting to obtain refugee status in Canada. Muhtorov's parents urged him to assist his brother with the immigration process. In August 2011, Muhtorov told Hurshid:

> You will go to Istanbul Turkey. I will talk to the brothers and solve your living arrangements and other things. We will submit your documents there. You will have an interview. I will find all your documents there . . . . There is an Islamic school there. You will study for 45 days and then you will leave . . . . You will come to America. You will come with my documents. Do you understand? You will come here as Jamshid.

Def. Trial Ex. 697A at 7.

On January 16, 2012, Muhtorov purchased a one-way ticket to Istanbul, Turkey, that was to depart five days later. He told countless contradictory stories about the length, destination, and purpose of his trip to every listening ear he could find.  In a call to his pregnant wife on January 19, 2012, he instructed her to prepare to leave the U.S. by filing for their tax refund as soon as possible, selling their furniture, and buying tickets for her and the children to meet him in Turkey. Gov't Trial Ex. 152A at 24, 33. Shortly before that call, he reminded his eight-year-old daughter: "Remember, I told you to pray for your Daddy to become a martyr . . . Don't pray, 'Don't let him leave!' It will be a curse for me . . . . Pray and say, 'Make my father a martyr, one of real martyrs.'" Gov't Trial Ex. 146A at 1.

Muhtorov discussed his travel plans with Jumaev for months until Jumaev complained: "Sir[,] I envy you. You too are leaving to a wedding. I want to go to the wedding, too." Gov't Trial Ex. 131A at 3. Less than two weeks before Muhtorov was to travel, Jumaev told him: "You

are going to die either way. You are going to die here as it is and you are going to die there as it is. What's the difference? The only one difference is that death over there is better!" Gov't Trial Ex. 149A at 26. Muhtorov responded: "It is so." *Id.*

To his friend Mustafa, Muhtorov claimed he would not be coming back from Turkey even though he had led his wife to believe he would. Gov't Trial Ex. 153A at 6-7. To the Confidential Human Source, Muhtorov first explained that he would leave for Turkey and take his family along, placing his children in a madrasa there while he determined how to proceed further. Gov't Trial Ex. 156A. As he became more eager to travel, Muhtorov described his feeling to the Source, saying: "[I]f God is protecting me now, then He will protect me at the wedding house as well . . . . I can't help it. I'm getting so excited." Gov't Trial Ex. 166A at 3. Then, days before leaving, he reported to the Source that the IJU wanted him to work in the propaganda and recruitment unit and not to "deploy to the wedding." Gov't Trial Ex. 168A at 12.

Muhtorov told his former employer that he was going to Istanbul to help his brother and asked if he would be able to get his job back. He did not say, however, that he would in fact be returning. Trial Tr. at 1414:21-1415:9, 1416:9-12. In contrast, he indicated to the taxi driver who drove him to the airport that he would only be gone for ten days to two weeks. Trial Tr. at 801:10-13.

So as not to "have all kind of problems at the airport," Muhtorov shaved off his beard before his flight. Gov't Trial Ex. at 9. On January 21, 2012, the day he was to fly out, he hired a taxi driver to spend three to four hours driving him around Chicago. At Muhtorov's direction, they went to Best Buy so he could purchase an iPad, to a mosque, to an Arabic restaurant, to an Apple Store where he picked up two new iPhones, and then to the airport. He paid the driver $600.

Muhtorov was arrested that afternoon at O'Hare Airport in Chicago. In his possession were $2,865 in cash and the two new iPhones and iPad. His luggage contained suits, bags of candy, immigration forms, documents regarding his work with Ezgulik, and a letter from Jewish Family Service of Colorado, among other items. He was also carrying his cellphone, on which he had downloaded many violent terrorist propaganda videos. After being advised of his rights, he admitted to FBI agents that he knew the IJU was a terrorist organization and that he had been in communication with the IJU website administrator.

At trial, Muhtorov testified on his own behalf. His counsel advanced the argument that he was playing "Jamshid the jihadi warrior" out of boredom and did not intend to follow through with his claims or actually support terrorism. His testimony supported this claim to some extent, but otherwise, provided no clear narrative regarding his actions.[3] In his testimony, he acknowledged he had the same principal goal as the IJU—to overthrow the Uzbek regime, specifically that of Islam Karimov, and he claimed he only communicated with the IJU and

---

[3]*See, e.g.*, Trial Tr. at 1085:8-14 ("[Q. O]nce -- and we'll get to this -- you got done doing what you were going to do over here in Central Asia, were you going to come home to the United States? A. Yes."); *id.* at 1191:9-16 ("[Q. I]f you were planning to come back to your wife and two children after you helped Hurshid, why didn't you buy a round-trip ticket? A. To start with, it was not clear when I would come back. Q. What do you mean by that? A. It was unclear how long it would take to solve Hurshid's issue. Also, I wanted to study at the Islamic mosque -- madrasa -- it's a religious school – in Turkey, in Istanbul."); *id.* at 1207:19-21 ("Q. Was it always your plan, if you had ever gotten over there, to come back to your wife and children here in America? A. Of course."); *id.* at 1274:2-16 ("I told [my wife] she would come visit me in Turkey if something happened. It wasn't -- there wasn't any particular plan. I was going to Turkey to see how things may develop. I wanted to see Abdulloh Buhoriy's madrasa, whether it's worth studying there, and if it would be good for my family. There is also Islamic school for children. I wanted to see if it's going to be -- if it's worth to move there and stay there, live there. Also, I wanted to see if it was possible to find a job in Turkey to survive. I talked about that with -- to my friends. And I was also thinking, if circumstances are good, conditions are good, that maybe I would move there, I would think about moving there. It wasn't 100 percent, but I needed to see whether I would want to live there or not and whether my children would be able to go to school there or not. *So if not, I would come back*.") (emphasis added); 1276:13-15 ("I wasn't sure whether I was coming back or not, even though I knew I had to come back to pick up my family.").

downloaded their videos to discover their strategy towards Uzbekistan. Trial Tr. at 1222:18-1223:16.

## II.

## U.S. SENTENCING GUIDELINES

I begin by calculating the applicable U.S. Sentencing Guidelines range for Muhtorov. I do so because I must, *see Gall v. United States*, 552 U.S. 38, 49 (2007), even though—as I have previously notified the parties and explained in sentencing Jumaev—I find the Guidelines illogical and inadequate in this case. *See Jumaev*, 2018 WL 3490886, at *8-13. Even if the following calculation is in error, however, it has no impact on the ultimate sentence. *See United States v. Sabillon-Umana*, 772 F.3d 1328, 1334 (10th Cir. 2014) (acknowledging that remanding for resentencing does not help the defendant or enhance the integrity of judicial proceedings when a district judge analyzes a case under alternative theories and indicates he or she would arrive at the same sentencing conclusion either way); *United States v. Gieswein*, 887 F.3d 1054, 1062-63 (10th Cir. 2018).[4]

A. Calculation of Guidelines Range

U.S. Sentencing Guideline (U.S.S.G.) § 2M5.3(a) sets the Base Level for a conviction under 18 U.S.C. § 2339B at 26. Muhtorov's three counts are grouped together under the Guidelines because they involve a common criminal objective and constitute part of a common scheme or plan. *See* U.S.S.G. § 3D1.2. Muhtorov has no known criminal history, making his

---

[4]As was true of the government's Sentencing Statement for Jumaev, the government's analysis here amounts to callous indifference or insouciance. If indeed government counsel read my Memorandum Opinion and Order on Sentencing for Jumaev, the failure to address the issues therein is stunningly inexplicable.

Criminal History Category I. Without any specific offense characteristics increase, adjustments, or departures, Muhtorov's Guidelines range is 63 to 78 months' imprisonment.

The Guideline for convictions under 18 U.S.C. § 2339B provides for a two-level increase "[i]f the offense involved the provision of (A) dangerous weapons; (B) firearms; (C) explosives; (D) funds with the intent, knowledge, or reason to believe such funds would be used to purchase any of the items described in subdivisions (A) through (C); or (E) funds or other material support or resources with the intent, knowledge, or reason to believe they are to be used to commit or assist in the commission of a violent act . . . ." U.S.S.G. § 2M5.3(b)(1).

Muhtorov contests the application of this increase. I find the government has demonstrated by a preponderance of the evidence that it is applicable. Muhtorov cites *United States v. Dhirane*, Nos. 17-4205, 17-4226, 2018 WL 3421085, at *7 (4th Cir. July 16, 2018), to emphasize that he must have known or had reason to believe that his support—$300 and providing himself as personnel—"*would be used* to assist in acts of violence by the terrorist organization." Muhtorov Sentencing Statement at 17-18. In focusing on the "would be used" portion of that statement, Muhtorov loses the significance of the word "assist." As found by Congress and endorsed by the Supreme Court, "[F]oreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 47 (2010) (quoting Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), § 301(a)(7), 110 Stat. 1247, note following 18 U.S.C. § 2339B (Findings and Purpose)). Muhtorov knew or had reason to believe that the $300, even if it went to feed the orphans of IJU fighters, would "assist" in acts of violence by freeing up other money to support that cause. Likewise, he knew or had reason to believe that offering himself as personnel to the organization, even as a propagandist or recruiter,

would "assist" others in the organization to engage in violent activity. Therefore, Muhtorov's offense level is subject to a two-level increase under U.S.S.G. § 2M5.3(b).

The Guidelines inquiry does not end there; the facts of this case and the parties compel me to consider numerous other adjustments and departures. First, I must evaluate the application of the so-called Terrorism Enhancement found in U.S.S.G. § 3A1.4. Since the government again contends the Obstruction of Justice Enhancement in § 3C1.1 is applicable, I must also iterate the unmet requirements of that provision. After resolving those issues, I consider Muhtorov's requests to reduce his offense level for acceptance of responsibility and depart based on his lack of criminal history, his prior good works and commitment to public service, and the immigration consequences he faces.

*Adjustments*

1. § 3A1.4:  Terrorism Enhancement

The Terrorism Enhancement in U.S.S.G. § 3A1.4 provides:

> (a) If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by 12 levels; but if the resulting offense level is less than level 32, increase to level 32.
> (b) In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

U.S.S.G. § 3A1.4. Thus, the Enhancement functions by both increasing the offense level at least 12 levels and moving the defendant to the highest Criminal History Category.

It applies when the predicate offense either "(1) 'involve[s]' a federal crime of terrorism or (2) [is] 'intended to promote' a federal crime of terrorism." *United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010). A "federal crime of terrorism" is defined, for the purposes of the Enhancement, as "an offense that—(A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and (B) is a

violation of—[a list of enumerated offenses, including] (i) section . . . 2339B (relating to providing material support to terrorist organizations) . . . ." Application Note 1 to U.S.S.G. § 3A1.4; 18 U.S.C. § 2332b(g)(5).

I first consider whether Muhtorov's predicate offenses "involve" a federal crime of terrorism. Since his offenses are enumerated in 18 U.S.C. § 2332b(g)(5)(B), I need only find that they were "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(g)(5); *Awan*, 607 F.3d at 316-17. "'Calculation' is concerned with the object that the actor seeks to achieve through planning or contrivance . . . Section 2332b(g)(5)(A) does not focus on the defendant but on his 'offense,' asking whether it was calculated, *i.e.*, planned—for whatever reason or motive—to achieve the stated object." *Awan*, 607 F.3d at 317. I find by a preponderance of the evidence that Muhtorov had the specific intent to influence the Uzbek government by providing the IJU with $300 and himself as personnel.

At trial, Muhtorov admitted he had the goal of overthrowing the Uzbek regime and was interested in the IJU because they had the same goal. Trial Tr. at 1222:18-1223:1. He communicated with the IJU's website administrator for years, eventually offering to assist with any task even if he had to risk death. He enrolled others in his schemes with the IJU, including Jumaev and the FBI Confidential Human Source. He used anonymizers and code words. For nearly a year before setting his plans in motion, he discussed his travels to Turkey, all the while waiting for an "invitation to the wedding". He then shaved his beard immediately before he embarked to avoid trouble in the airport. He was calculated.

Even if Muhtorov did not directly intend to influence, affect, or retaliate against a government, which I find he did, his offenses "intended to promote" the commission of federal crimes of terrorism by others, namely IJU members. "[A]n offense is 'intended to promote' a

federal crime of terrorism when the offense is intended to help bring about, encourage, or contribute to" such a crime. *Awan*, 607 F.3d at 314. I find Muhtorov's conspiracy and attempt to provide $300 and his attempt to provide himself as personnel were carried out with the intent to encourage or contribute to the IJU's commission of federal crimes of terrorism. Muhtorov had in-depth knowledge of and supported the IJU's mission and activity. *See*, *e.g.*, Gov't Trial Ex. 125A at 2-3; Trial Tr. at 1222:24-1223:1. He knew what the organization was up to, i.e., federal crimes of terrorism, and he endeavored to assist it.

Thus, Muhtorov's offenses qualify under either prong of the Terrorism Enhancement. As the Enhancement requires, his offense level is subject to a 12-level increase and he is placed in Criminal History Category VI.

## 2. § 3C1.1: Obstruction of Justice Enhancement

The government argues, as it did for Jumaev's sentencing, that the Obstruction of Justice Enhancement in U.S.S.G. § 3C1.1 mandates that I increase Muhtorov's offense level by two levels. The enhancement is only applicable if the government demonstrates by a preponderance of the evidence that:

> (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense . . . .

U.S.S.G. § 3C1.1. The government highlights two examples of conduct covered by the adjustment—committing perjury "if such perjury pertains to conduct that forms the basis of the offense of conviction" and "providing materially false information to a judge or magistrate judge." Application Note 4 to U.S.S.G. § 3C1.1.

To establish that Muhtorov has committed perjury for the purposes of the Enhancement, the government must show his conduct fulfills the elements of the criminal statute. "A witness testifying under oath or affirmation violates [the criminal perjury statute] if []he gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993). Additionally, as observed in *United States v. Massey*, 48 F.3d 1560, 1573 (10th Cir. 1995), "it has long been a requirement in the Tenth Circuit that the perjurious statement be identified, at least in substance."

The government claims Muhtorov's perjurious statements are: "that the $300 payment from JUMAEV was repayment of a debt and not intended for the IJU; that he continued assisting the IJU in order to earn their trust as part of carrying on a fantasy persona; and, that he did not travel in order to join the IJU." Gov't Am. Sentencing Statement at 12, ECF No. 1944-1. The government argues that the jury's verdict demonstrates that it rejected Muhtorov's testimony on these matters.

However, the Supreme Court has cautioned: "[N]ot every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury . . . . [The accused's] testimony may be truthful, but the jury may nonetheless find the testimony insufficient to excuse criminal liability or to prove lack of intent." *Dunnigan*, 507 U.S. at 95. The prosecution demands I dismiss Muhtorov's statements as fabrication. I am unwilling to do so and have no legal basis to conclude the jury did. The facts were fairly uncontested, and there is no indication that Muhtorov had the willful intent to provide false testimony. His defense propounded the legitimate question: Was he engaging in make-believe and only posing as a violent jihadist or was he engaging in criminal activity? The jury's verdicts, including the not

guilty verdict, reflect its interpretation of the facts, not a judgment that Muhtorov provided false testimony.

The government has failed to otherwise show that Muhtorov willfully attempted to obstruct or impede the administration of justice. Accordingly, the Obstruction of Justice Enhancement is inapplicable.

3. § 3E1.1: Acceptance of Responsibility

Presumably because I have expressed my disapproval of the so-called trial tax, Muhtorov argues that his offense level should be decreased for acceptance of responsibility, despite the fact that he took his case to trial. I agree in principle that a defendant's decision to exercise his constitutional right to a trial does not preclude him from being eligible for an acceptance of responsibility reduction. Here, however, Muhtorov's "acceptance of responsibility" is incomplete. He has generally admitted to making the statements the government recorded and to viewing the videos found on his electronic devices. But his representations regarding much of his conduct which is the basis for his offenses have been equivocal and inconsistent. I do not regard such circular explanations and justifications as acceptance of responsibility. Even if many of the statements he made were exaggerations, there was never a clear line drawn between truth and fiction. Consequently, I find the adjustment is inappropriate in this case.

*Departures*

1. § 4A1.3: Criminal History Departure

Since I have found the Terrorism Enhancement is applicable to Muhtorov's offenses, his Criminal History Category is elevated from the lowest—I—to the highest—VI. As a result, Muhtorov asserts that he is entitled to a departure under U.S.S.G. § 4A1.3, which provides: "If

reliable information indicates that the defendant's criminal history category substantially overrepresents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes, a downward departure may be warranted." U.S.S.G. § 4A1.3(b)(1). A sentencing judge may therefore depart downward to counter the Terrorism Enhancement if he or she determines that it overrepresents "the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes." *See United States v. Meskini*, 319 F.3d 88, 92 (2003); *United States v. Benkahla*, 501 F.Supp.2d 748, 758 (2007).

 I am aware of no evidence indicating that, solely based on the crimes Muhtorov has committed, he is the most likely of all offenders to recidivate.[5] I am concerned, however, that Muhtorov will again struggle to find his place in society and to dedicate his talents to lawful endeavors, especially now that he is branded a felon and a terrorist. His primary enemy—Islam Karimov—is deceased, but the persecution of Muslims across the world continues unabated. Will he find a way to support worthy causes wherever he lands without engaging in criminal activity? Based on the evidence presented to me, I believe it is likely he will. While a Criminal History Category of VI substantially overrepresents Muhtorov's criminal history and the likelihood he will commit other crimes, I find a Criminal History Category of II does not.

---

[5]I again am influenced by the comments of Judge George O'Toole in *United States v. Mehanna*, No. 1:09-cr-10017-GAO (D. Mass. April 12, 2012), and of James P. McLoughlin, Jr. in *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 114-15 (2010), referenced in my Memorandum Opinion for Jumaev's sentencing. *See Jumaev*, 2018 WL 3490886, at *9.

## 2. § 5H1.11: Public Service, Record of Prior Good Works Departure

Muhtorov also seeks a departure under U.S.S.G. § 5H1.11 for his past good works and public service as a human rights defender in Uzbekistan. While his previous work is commendable, his crimes here demonstrate that he does not respect the line Congress has drawn between activism and terrorism. Furthermore, it is unclear at this time that his crimes are an aberration in his path as a public servant. He did not merely dabble in or flirt with terrorism; he testified that he embraced its ideals after significant exploration over time. I find Muhtorov has failed to demonstrate that his case is one of the "exceptional" ones in which a departure is merited. *See* U.S.S.G. ch. 5, pt. H, introductory commentary ("[A]lthough these circumstances are not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range, they may be relevant to this determination in exceptional cases."). Nevertheless, his prior human rights work is a valid consideration under the 18 U.S.C. § 3553(a) factors and is taken into account under that framework.

## 3. § 5K2.0: Extraordinary Circumstances

Lastly, Muhtorov urges me to depart under U.S.S.G. § 5K2.0 on the basis that, after he completes his sentence in this case, he faces indefinite immigration detention in the U.S. or deportation to Uzbekistan. The Tenth Circuit "has determined that deportable alien status is not a ground for departing downward." *United States v. Gutierrez*, 506 Fed. App'x 714, 722 (2012) (unpublished) (citing *United States v. Mendoza-Lopez*, 7 F.3d 1483, 1487 (10th Cir. 1993); *United States v. Castro-Rivas*, 254 Fed. App'x 742, 752 (10th Cir. 2007) (unpublished); *United States v. Tamayo*, 162 Fed. App'x 813, 816 (10th Cir. 2006) (unpublished)). If Muhtorov's deportability is not grounds for a downward departure, neither is the potential for him to spend

an indefinite period in immigration detention. As with his history of human rights work, these circumstances are more appropriately assessed under 18 U.S.C. § 3553,[6] which I do below.

*Final Range*

      With those matters decided, I turn to the Sentencing Guidelines' prescribed Table. After applying the specific offense characteristic increase under § 2M5.3(b) and the Terrorism Enhancement, the resulting offense level is 40. My departure under § 4A1.3 places Muhtorov in Criminal History Category II. The Guidelines range is, therefore, 324 to 405 months' imprisonment with one year to life of supervised release and a $25,000 to $250,000 fine.

## B. Rejection of Guidelines

      As I explained in detail in my Memorandum Opinion and Order on Sentencing for Jumaev, I find the Guidelines to be inadequate and illogical as applied to terrorism-related cases and the facts of this case in particular. *See Jumaev*, 2018 WL 3490886, at *8-13. In the terrorism context, the basic problem with the Guidelines is the utter vacuity of empirical evidence or facts employed by the Sentencing Commission in forming them. In this respect, the Guidelines are the epitome of *ipse dixit*—"because the Commission says so."[7] The failure of the Guidelines is not limited to the terrorism context, however. Critiques of the Guidelines' wide-ranging faults are

---

[6] *See United States v. Sanchez-Leon*, 764 F.3d 1248, 1263-64 (10th Cir. 2014). While Muhtorov's immigration consequences and the time he will likely spend in ICE detention are not considered as a basis for departing under the Guidelines, they are relevant for evaluating the severity of the punishment Muhtorov will endure for these crimes and how to protect the public under 18 U.S.C. § 3553.

[7] Kate Stith & José Cabranes, *Judging under the Federal Sentencing Guidelines*, 91 NW. U. L. REV. 1247, 1271-72 (1997).

numerous and enduring.[8] I have found their application to be similarly specious in many cases

under diverse circumstances.[9] So, too, I reject the advisory Guidelines range here and instead

sentence Muhtorov based on a full consideration of the criteria set forth in 18 U.S.C. § 3553(a).


III.

APPLICATION OF 18 U.S.C. § 3553(a) FACTORS

As with Jumaev's sentence, I must craft a sentence for Muhtorov that is "sufficient, but

not greater than necessary . . . (A) to reflect the seriousness of the offense, to promote respect for

the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to

criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to

provide the defendant with needed educational or vocational training, medical care, or other

correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). I must also

examine the nature and circumstances of the offense and Muhtorov's history and characteristics,

---

[8]*See, e.g.*, Judge Jed S. Rakoff, *Why the Federal Sentencing Guidelines Should Be Scrapped*, 26 Fed. Sent. R. 6, 7 (2013) (observing that "[p]erhaps the most fundamental flaw in the Sentencing Guidelines is that they are based on the assumption that you can, in the name of reducing disparities, isolate from the complexity that every sentence presents a few arbitrary factors to which you then assign equally arbitrary weights— and somehow call the result "'rational'"); Mark Osler and Judge Mark W. Bennett, *A "Holocaust in Slow Motion?" America's Mass Incarceration and the Role of Discretion*, DePaul J. for Soc. Just. 117, 142 (2014) (describing the Guidelines as a "carnival funhouse mirror riddled with distortions"); Paul Hofer, *After Ten Years of Advisory Guidelines, and Thirty Years of Mandatory Minimums, Federal Sentencing Still Needs Reform*, 47 U. Tol. L. Rev. 649, 669 (2016) (emphasizing that "today's Guidelines do cloak penalties created by the political branches as the product of an independent agency in the Judicial Branch").

[9]*See, e.g.*, *United States v. Williams*, No. 16-cr-00111-JLK, 2018 WL 1014141, at *1-2 (D. Colo. Feb. 22, 2018) (in a false statement case for their arbitrary prioritization of the amount of the economic loss as the most significant sentencing factor); *United States v. Cheever*, No. 15-cr-00031-JLK, 2016 WL 3919792, at *2 (D. Colo. Jul. 18, 2016) (in a child pornography case for failing to embody any of the Commission's expertise); *United States v. Worku*, No. 12-cr-346-JLK, 2014 WL 2197537, at *8-9 (in an unlawful procurement of documents and identity theft case for the lack of relevant empirical evidence supporting them).

the kinds of sentences available, and the imperative to avoid unwarranted sentencing disparities. *See id.* § 3553(a).

A. Nature and Circumstances of the Offenses and Muhtorov's History and Characteristics

Here, more so than it was for Jumaev, it is tempting to buy into the notion that "a terrorist is a terrorist." *See* George D. Brown, *Notes on A Terrorism Trial - Preventive Prosecution, "Material Support" and the Role of the Judge After United States v. Mehanna*, 4 Harv. Nat'l Sec. J. 1, 54 (2012). Muhtorov's conduct comports with that of more serious offenders than Jumaev, and his circumstances are undoubtedly not the result of chance. Nevertheless, as I have emphasized, even in this context sentencing cannot be reduced to a battle between good and evil. Muhtorov is a complex person, born a canvas like the rest of us. As Professor Katherine Donahue has sagely warned: "Evil is not a cause for behavior; it is a result. Seeing evil as a cause for behavior removes any need to understand why terrorists act as they do." Katherine C. Donahue, Slave of Allah: Zacarias Moussaoui vs. The USA 53 (2007).[10] In a time when all are enticed to reduce matters to black or white, left or right, same or different, one must respect nuance and complexity and ask "why?"

Muhtorov's offenses are serious and his rhetoric is frightening. Although his statements and conduct are conflicting and difficult to decipher, they are revealing. He swore an oath of allegiance to the IJU and offered to risk his life for it.[11] He sent a picture of his actual children to a terrorist organization. Regardless of any explanation he might have, he also told his eight-year-

---

[10]Professor Donahue's analysis of Zacarias Moussaoui is profound. While I deemed it to be relevant for Jumaev, it is particularly so for Muhtorov. Indeed, she comments that Moussaoui took on the jihadist cause "because it gave him a role in the fight for social and economic justice." Donahue at 54.

[11]The fact that he did so in an improper manner and that his oath was never accepted demonstrates that Muhtorov was sloppy and the IJU took notice. It does not, however, undermine the genuineness of his commitment.

old daughter not to pray for him to stay but to pray instead that he would become a martyr. Gov't Trial Ex. 146A at 1.

In a single conversation with his wife, it becomes apparent that Muhtorov was always scheming in some way. In filing their tax return, he directed her to inflate their donations for the year and to represent that he had not worked. Gov't Trial Ex. 152A at 4-5. He suggested that she rip their couch apart at the seams so the store would replace it with a new one she could sell for more money. *Id.* at 27. He also advised her to tell their family friend they were only traveling to Turkey for two or three months and they would rent their apartment again when they returned, when the true plan was for the family to relocate there permanently. *Id.* at 33-34.

Muhtorov's conduct makes it clear that he was searching for something. He explained at trial and told a very similar story to the CHS that he went from Muslim sect to sect looking for the right fit. In his adjustment to life as an immigrant in the U.S., he went from a human rights advocate to the monotony of cleaning casinos and the isolation of driving a truck. He found no acceptable channel for his ambition and spent his hours on the road desperate for connection.

It is telling that Muhtorov's delusions of grandeur involved him working as a propagandist and recruiter. Based on his intercepted conversations and his enthusiasm for discussing extremist ideas, it seems likely he would have been dangerous in that role. But he did not boast he would kill more people than any other jihadist or that he would help to build the most destructive weapons.

Still, Muhtorov's need for connection and passion for those he considers to be his people reinforced his inclination to support violence. Dr. Marc Sageman, a psychiatrist and expert in terrorism, advises that "[t]he most caring and self-sacrificing for their group, because they identify most with it, are most at peril to turn to violence." Marc Sageman, Misunderstanding Terrorism at 174 (2017).

Muhtorov is mistaken in believing his creation of "Jamshid the jihadi warrior" was not dangerous. In studying political violent perpetrators, Dr. Sageman has determined that "[i]n the turn to political violence, identity trumps both ideology and self-interest." Sageman, *supra*, at 174. Muhtorov fabricated this identity for himself, and as he began to see himself as this jihadi, it became more and more likely that he would follow through with supporting terrorism. While I am not convinced that Muhtorov would have ever made it to deliver himself or the $300 to the IJU (we will thankfully never know), I do not doubt that he intended to open that door in flying to Turkey. He made a poor choice, but not an innocent one.

B.  Need for the Sentence Imposed

The government recommends a sentence of 30 years' imprisonment. This recommendation reflects its inability or refusal to assess the real threat Muhtorov posed.[12] To achieve a sentence that is "sufficient, but not greater than necessary," I must assess the threat Muhtorov caused and still poses.

*To Reflect the Seriousness of the Offense, To Promote Respect for the Law, and To Provide Just Punishment*

Again, here, I ask: What sentence is necessary to convey that *any* support for terrorism will not be tolerated? Muhtorov attempted to travel to join and to provide financial support to a terrorist organization. Regardless of whether his contribution aided orphans or whether he was limited to engaging in propaganda and recruiting, he would have furthered the illicit causes of a violent organization. He wanted to and did help spread propaganda for that organization. He

---

[12]*See* Sageman, *supra*, at 22 (observing generally that, in "trying to prevent a repeat of 9/11, [the U.S. government] has again and again let its imagination run wild and responds to worst-case scenarios without objectively assessing the real threat."); Khaled A. Beydoun, American Islamophobia: Understanding the Roots and Rise of Fear, *passim* (2018).

encouraged others, including Jumaev, to discuss and support violent jihad. Although he contends he only sought to please others, it is clear he often initiated the subject matter and prioritized the topic.

Muhtorov has already suffered significant punishment, though. He has been detained for 6 years, 7 months, and 9 days. As the Presentence Investigation Report documents, his mental health has suffered as a result. *See* Revised Presentence Investigation Report at 20, ECF No. 1957. When he was arrested, his wife was pregnant with their third child. He has been fully absent for the first six years of that child's life. He has been humiliated and humbled. His personal conversations with his wife and family members have been aired in public. Many of his family and friends have had additional burdens placed on them as a result of his prosecution and have had to testify in this Court.

I also consider the immigration consequences for Muhtorov. On July 14, 2018, ICE placed an immigration detainer on him. The defense's submission of a formal opinion by an immigration law expert advises that Muhtorov's convictions render him statutorily deportable, inadmissible to return to the United States, and ineligible for U.S. citizenship. Attach. A to Muhtorov's Mot. Variant Sentence at 1, ECF No. 1955-1.

When Muhtorov is released from serving his sentence in this case, he will be directly transferred to ICE and, in the opinion of the immigration expert, will remain in "custody for a significant period of time, which may amount to years, or until he is removed from the United States." *Id.* at 2. If Muhtorov can show that he would more likely than not be tortured if removed to Uzbekistan, he could be granted deferral of removal under the Convention Against Torture (CAT), *see* 8 C.F.R. § 208.17. However, deferral is an uncertain and precarious remedy for Muhtorov. He would still be subjected to prolonged detention and, if he is ever released in the U.S., would be under a permanent order of supervision likely requiring electronic monitoring. At

any time, ICE could also seek to terminate deferral by demonstrating that Muhtorov is able to return to Uzbekistan without risk of being tortured there. These prospects are significant repercussions resulting from his conviction in this case.

*To Afford Adequate Deterrence to Criminal Conduct*

With respect to Muhtorov personally, one cannot know with certainty what would deter him from further criminal activity. I am persuaded by the research that individuals are deterred more by the certainty of being caught than the severity of the punishment.[13] I recognize the unique nature of terrorism cases often makes them difficult for the government to investigate and prosecute. This case is the prime example of the extraordinary means they demand. I am convinced, however, the message has been delivered to Muhtorov, and all others paying attention, that no resource will be withheld in pursuing anyone who violates the law by supporting terrorism.

*To Protect the Public from Further Crimes by Muhtorov*

This conviction will undoubtedly make it more difficult for Muhtorov to associate himself with causes that are not illicit. He will be branded forever as a terrorist. I expect the human rights community he was once a respected member of will no longer accept him. Still, as

---

[13]*See* Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 252-53 (2013) ("There is little evidence that increasing already long prison sentences has a material deterrence effect. Evidence on the deterrent effect of the certainty of punishment is more consistent . . . ."); Valerie Wright, *Deterrence in Criminal Justice Evaluating Certainty vs. Severity of Punishment*, Sentencing Project Rep. (2010), *available at* https://www. sentencingproject.org/wp-content/uploads/2016/01/Deterrence-in-Criminal-Justice.pdf ("Criminological research over several decades and in various nations generally concludes that enhancing the certainty of punishment produces a stronger deterrent effect than increasing the severity of punishment.").

discussed above, I believe Muhtorov is likely to avoid future criminal activity. He has significant family support and understands how to begin life anew.

After serving his sentence in this case, Muhtorov will eventually be deported, or he will be held in custody until his detention is "well outside the general parameters for prolonged custody." Attach. A to Muhtorov's Mot. Variant Sentence at 3. Whatever transpires, he will be detained for months and likely years following completion of his sentence in this case, and as long as he remains in the United States, he will be subject to some form of restraint and supervision.

Additionally, as I explained in sentencing Jumaev, without adequate services and rehabilitation programs in prison, further radicalization is a concern with longer terms of imprisonment. *Jumaev*, 2018 WL 3490886, at *15-16.

*To Provide Muhtorov with Needed Training, Medical Care, or Other Treatment*

To my knowledge, the Bureau of Prisons offers no training or rehabilitation programs relevant to Muhtorov's crimes.[14] Nevertheless, the opportunity for him to pursue additional education opportunities while imprisoned could greatly benefit him as he tries to build a new life upon release.[15]

---

[14] *See* Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1567 (2017) (explaining that programs focused on rehabilitating individuals convicted of terrorism offenses have not been instituted in American prisons); *United States v. Bell*, 81 F.Supp.3d 1301, 1318 (M.D. Fla. 2015) (citing testimony by a Federal Bureau of Prisons representative that "the BOP currently has no programs for de-radicalizing prisoners convicted of crimes of terrorism").

[15] *See* SpearIt, *Muslim Radicalization in Prison: Responding with Sound Penal Policy or the Sound of Alarm?*, 49 Gonz. L. Rev. 37, 78 (2013). ("The best course to successful return to society is educational training on the inside. Although, there is little empirical research on whether education reduces recidivism, education may militate against extremism directly, since groups like al-Qaeda have been known to prey on uneducated individuals to conduct their violent biddings.").

C.  Sentences Available

The maximum penalty for each of the three counts on which Muhtorov was convicted is 15 years' imprisonment, lifetime supervised release, and a $250,000 fine.  The terms of imprisonment could be imposed to run consecutively for a maximum sentence of 45 years' imprisonment. I have found the Procrustean[16] calculations of the Sentencing Guidelines advise a sentence 324 to 405 months' imprisonment.

Under 18 U.S.C. § 3585, Muhtorov has the right to receive credit toward the service of the term of imprisonment for the time he has already spent in detention.  *See United States v. Wilson*, 503 U.S. 329 (1992). In determining the appropriate length of Muhtorov's sentence, I take into account the 6 years, 7 months, and 9 days of presentence confinement he has served as of this date, August 30, 2018. The U.S. Bureau of Prisons' Designations and Sentence Computation Center advised that Muhtorov will be awarded full credit for his presentence confinement, since he was initially arrested for criminal conduct and not held for immigration administrative purposes. *See* Revised Presentence Investigation Report at 2, n. 2, ECF No. 1957. If, for any reason, the Bureau of Prisons does not credit this time served in computing his release date, I will correct this error on presentation of a motion or petition for writ and resentence him.


D.  Need to Avoid Unwarranted Sentence Disparities

There is no rational basis for the government's recommendation of a 30-year sentence. In support of its argument that such a sentence would avoid unwarranted sentence disparities, it directs me to the first 15 cases in its table of examples of 18 U.S.C. § 2339B convictions. Significantly, only three of the defendants listed received sentences of 30 years of imprisonment

---

[16] I use "Procrustean" in its literal sense of action "marked by arbitrary often ruthless disregard of individual differences or special circumstances." Webster's Collegiate Dictionary (10th ed.)

or more: Tairod Nathan Webster Pugh, Nader Elhuzayel, and Muhanad Badawi.[17] None of these

defendants' conduct aligns in a substantial way with Muhtorov's.

*Tairod Nathan Webster Pugh*

In *United States v. Pugh*, No. 1:15-cr-00116 (E.D.N.Y.), Tairod Nathan Webster Pugh,

an honorably discharged veteran of the U.S. Air Force, traveled to Turkey with plans to cross

into Syria to fight with the Islamic State of Iraq and the Levant (ISIS).[18] Although he maintained

that he intended to fight Bashar al Assad with U.S. backing and had no contact with members of

ISIS, evidence at trial showed his support for ISIS and the implausibility of his story. He was

charged with one count of attempting to provide himself as personnel to a foreign terrorist

organization, in violation of 18 U.S.C. § 2339B, and with obstruction and attempted obstruction

of an official proceeding, in violation of 18 U.S.C. § 1512. A jury convicted him of both counts.

Pugh's Guidelines range was 360 months to 420 months. At sentencing, the judge emphasized

that the proceedings were not a result of his religion but instead a consequence of his betrayal of

his country. He was sentenced to 180 months' imprisonment with 5 years of supervised release

for the § 2339B conviction and 240 months' imprisonment with 3 years of supervised release for

the § 1512 conviction, the terms of imprisonment to run consecutively and the terms of

supervised release to run concurrently. Pugh's sentence was within the advisory Guidelines

range and was the maximum term of imprisonment permitted under the statutes of conviction.

---

[17]Most notably, Fazliddin Kurbanov, who was in possession of bomb-making components and had communicated with the IMU regarding his desire to build a bomb and possible targets in the United States, received a sentence of 25 years' imprisonment. *United States v. Kurbanov*, No. 1:13-cr-00120 (D. Idaho), Findings and Conclusions of Law in Support of J., ECF No. 282.
[18]ISIS goes by many names, among them: the Islamic State of Iraq and Syria, Al-Qa'ida in Iraq, and the Islamic State.

*Nader Elhuzayel and Muhanad Badawi*

In *United States v. Elhuzayel*, No. 8:15-cr-00060 (C.D. Cal.), Nader Elhuzayel and Muhanad Badawi conspired to send Elhuzayel to Syria to fight with ISIS. They engaged in bank and financial aid fraud and used the money to purchase Elhuzayel's plane ticket. They were each convicted at trial of two counts under § 2339B—conspiring and attempting to provide material support to ISIS. (They were also convicted of additional counts of fraud.) For each of the two material support counts, the defendants were sentenced to 180 months' imprisonment with the sentences to be served consecutively, resulting in sentences of 360 months, or 30 years.[19] Each defendant also received a term of lifetime supervised release.

Elhuzayel and Badawi were among the first defendants to be sentenced by a District Court after conviction at trial of conspiracy or attempting to provide material support for ISIS. At sentencing, the judge recognized that ISIS poses a unique threat because of its brutality towards civilians and recruitment of young fighters for violent jihad. He concluded that the defendants' staunch commitment to ISIS ideology rendered them an ongoing danger to society. They were unremorseful and so radicalized that they would be extremely difficult to rehabilitate.

Instead of blindly grouping Muhtorov with defendants who received 30 years, as the government asks, I am guided by other cases with similar facts. Sentencing is not an exercise in shooting an arrow into the air. To avoid disparate sentences, a defendant must be placed properly on the continuum of like cases. Although material support travel cases remain relatively few in

---

[19]Contrasting the *Elhuzayel* and *Pugh* cases exposes another idiosyncrasy of the Terrorism Enhancement. By "advising" judges to impose consecutive sentences until the Guidelines range is reached, usually at the statutory maximum for the counts, a defendant's sentence is potentially doubled when he or she is charged with conspiracy in addition to the underlying offense.

number and Muhtorov's circumstances are unique, the following cases generate a reliable scale.[20]

*Gufran Ahmed Kauser Mohammed*

In *United States v. Mohammed*, No. 1:13-cr-20364 (S.D. Fla.), Gufran Ahmed Kauser Mohammed pleaded guilty to one count of violating § 2339B. At sentencing, the government highlighted that he "provide[d] 15 separate payments of support totaling over $30,000 over the course of two years" for al-Qaida, al-Nusra Front, and al-Shabaab. Sentencing Tr. at 6:2-5, 19-25, ECF No. 262. In some instances, he specifically authorized the money to be used to purchase weapons and finance an attack on Americans. During that time he also engaged in recruitment activities for designated terrorist organizations and encouraged others to go participate in insurgencies occurring overseas. The judge emphasized that while Mohammed may have gotten carried away on the internet, his conduct was extremely aggravated and thus there was no basis for a variance. He was sentenced to 180 months' imprisonment, the maximum sentence permitted by statute, plus ten years' supervised release.

*Donald Ray Morgan*

In *United States v. Morgan*, No. 1:14-cr-00414 (M.D.N.C.), Donald Ray Morgan pleaded guilty to one count of violating § 2339B. A North Carolina native who moved to Beirut, Lebanon, he purchased a ticket to enter Syria and participate in jihad. He posted numerous Tweets over the course of several months indicating his knowledge of and support for ISIS,

---

[20]I include in this review three cases in which the defendant's statute of conviction was 18 U.S.C. § 2339A instead of § 2339B, noting the difference but finding the cases to still be relevant. Additionally, I considered, but do not describe here, travel cases in which the most useful information to this analysis (i.e., the reasoning or justification for the sentence imposed) is sealed or otherwise unavailable.

including posts that read: "Killing our enemies and beheadings are justified" and "If you have been protesting and campaigning and begging the enemy to stop killing u, It's probably time to get an [AK]47 and stop the threat." *Morgan*, No. 1:14-cr-00414, Factual Basis at 6-7, ECF No. 4. For violating § 2339B, Morgan was sentenced to 180 months' imprisonment plus three years' supervised release. (He was also sentenced to an additional 63 months for a separate charge of felon in possession of a firearm.)

*Adam Dandach*

In *United States v. Dandach*, No. 8:14-cr-00109 (C.D. Cal.), Dandach pleaded guilty to one count of violating § 2339B, attempting to provide himself as personnel to ISIS, and to one count of violating 18 U.S.C. § 1542, making a false statement in a passport application. He was arrested as he attempted to travel to Syria via Turkey to join ISIS. He admitted to FBI agents that he intended to pledge allegiance to the leader of ISIS and to take weapons training to defend Islam's invaded lands. He obtained an expedited 2014 passport for the trip by lying about the supposed loss of his previous passport, which had actually been confiscated by a concerned family member. He was sentenced to 180 months' imprisonment with lifetime supervised release for the § 2339B count, and 120 months' imprisonment for the § 1542 count. At sentencing, the judge determined the sentences should run concurrently instead of consecutively. The judge considered Dandach's long-standing emotional and psychological problems and acknowledged that his depression and other mental difficulties were severe enough to distinguish him from a typical case.

*Khalid Awan*

In *United States v. Awan*, No. 1:06-cr-00154 (E.D.N.Y.), a jury convicted Awan of two counts of violating 18 U.S.C. § 2339A, conspiracy to provide material support to terrorists and providing material support to terrorists, and one count of money laundering with the intention of promoting an offense against a foreign nation, involving murder and destruction of property in violation of 18 U.S.C. § 1956(a)(2)(A). Over several years, he transferred more than $60,000 to the Khalistan Commando Force ("KCF"), a militant Sikh separatist group responsible for hundreds of bombings and thousands of deaths in India. He also attempted to recruit at least one individual to travel to Pakistan to join the KCF and receive military training.

The sentencing judge characterized Awan as "a boaster, a salesman and a . . . terrorist groupie," and reasoned that he was amenable to deterrence because his motives were not embedded in ideological fanaticism so strong it could not be quelled. Am. J. at 10-11, ECF No. 259. Although Awan faced an effective Guidelines sentence of 45 years, the statutory maximum sentence for his three counts, the judge determined that a non-guideline sentence was appropriate, especially given the absence of any evidence that he committed an act of violence. He was sentenced to 168 months' imprisonment and three years' supervised release.[21]


*Nicholas Teausant*

In *United States v. Teausant*, No. 14-cr-00087 (E.D. Cal.), Teausant pleaded guilty to one count of attempting to provide himself as personnel to ISIS in violation of § 2339B. He intended

_____

[21]Awan was first sentenced immediately following trial, but the sentence was vacated on appeal on grounds that the district court judge erred in his application of the terrorism enhancement. *Awan*, 607 F.3d at 318. At resentencing, a different judge calculated a higher guidelines range pursuant to the remand order, but otherwise agreed with much of the first judge's analysis and imposed the same sentence.

to travel to Syria to join ISIS but was stopped at the Canadian border. Teausant was sentenced to 144 months' imprisonment plus 25 years' supervised release.

After considering the factors set forth in 18 U.S.C. § 3553(a), the judge determined that a 36-month variance from the 15-year statutory maximum and Guidelines recommendation was appropriate. The nature and circumstances of the offense created a dilemma for the judge, who found Teausant "was one of the least successful want-to-be or would-be terrorists probably in most of the cases that have been charged in this country." Sentencing Tr. at 34:6-12, ECF No. 87. The judge noted that, although Teausant's crime did not involve victims or attempts to build or obtain weapons, the end game was that he would have become a member of a terrorist organization. *Id.* at 35:2-9. Concluding that the government's recommended sentence of 9 years failed to sufficiently reflect the seriousness of the offense or the need to provide deterrence and protect the public, the judge sentenced Teausant to 12 years' imprisonment.

*Hamza Naj Ahmed and Zacharia Abdurahman*

In *United States v. Ahmed*, No. 1:15-cr-00049 (D. Minn.), Ahmed and Abdurahman each pleaded guilty to one count of conspiracy to provide material support in violation of 18 U.S.C. § 2339B. (Ahmed also pleaded guilty to an additional financial aid fraud charge.) Along with several others from Minnesota, Ahmed and Abdurahman attempted to travel to Syria to join ISIS. The judge noted that each member of the conspiracy took affirmative steps to travel overseas to fight with ISIS, "one of the most dangerous and violent terrorist organizations the world has ever known." Abdurahman Sentencing Mem. and Op. at 2, ECF No. 833; Ahmed Sentencing Mem. and Op. at 3, ECF No. 820. They were each sentenced to 120 months' imprisonment plus 20 years' supervised release.

Although the judge acknowledged the defendants were both young men without criminal histories, he was concerned that they took affirmative steps to join ISIS, especially "given that other young men from Minnesota and elsewhere have left the country" and died while engaging in terrorist acts for groups including ISIS. Abdurahman Sentencing Mem. and Op. at 15; Ahmed Sentencing Mem. and Op. at 16. The judge determined that a 10-year prison sentence would deter others from committing similar crimes, ensure the safety of the public, and avoid unwarranted sentencing disparities.

*Avin Marsalis Brown and Akba Jihad Jordan*

In *United States v. Brown*, No. 1:14-cr-00058 (E.D.N.C.), Brown and Jordan each pleaded guilty to one count of conspiracy to provide material support to terrorists under § 2339A. In conversations with confidential human sources working for the FBI, they expressed a desire to fight non-Muslims overseas and discussed plans to travel abroad for jihad. Jordan repeatedly emphasized the need to train with firearms and allowed Brown and an FBI source to handle weapons he owned, including an AK-47. "[O]n numerous occasions [they] discussed the need to obtain passports to travel overseas for purposes of violent jihad." Criminal Compl. at 5, ECF No. 1. Jordan had taken steps towards getting his passport but was not yet ready to travel at the time Brown attempted to fly overseas. Arrested at the airport, Brown stated he intended to travel to Syria via Turkey. After sealed sentencing proceedings, the court issued judgments sentencing Brown to 92 months' imprisonment plus 5 years' supervised release, and Jordan to108 months' imprisonment plus 5 years' supervised release.

*Joseph Hassan Farrokh*

In *United States v. Farrokh*, No. 1:16-cr-00020 (E.D. Va.), Farrokh pleaded guilty to conspiracy to provide and attempt to provide himself as personnel to ISIS in violation of § 2339B. He was arrested at the airport when attempting to travel to Syria to join ISIS. Farrokh was not himself a recruiter but was recruited by his co-defendant, who put Farrokh in contact with people to facilitate his travel. The sentencing judge considered Farrokh's acceptance of responsibility, his willingness to cooperate, and his renouncement of ISIS. Farrokh was sentenced to 102 months' imprisonment plus 10 years' supervised release.

*Muhammad Oda Dakhlalla*

In *United States v. Dakhlalla*, 1:15-cr-00098 (N.D. Miss.), Dakhlalla pleaded guilty to one count of conspiracy to provide himself as personnel to ISIS in violation of § 2339B. He and his co-conspirator planned to travel to join ISIS. The sentencing judge determined that mitigating factors warranted a variance from both the statutory maximum of 240 months and the 144-month limit agreed to by the parties under the plea agreement. The judge emphasized Dakhlalla's youth, lack of criminal history, and contrition, and sentenced him to 96 months' imprisonment plus 15 years' supervised release.

*Michael Todd Wolfe*

In *United States v. Wolfe*, No. 1:14-cr-00213 (W.D. Tex.), Wolfe pleaded guilty to one count of violating § 2339A. Wolfe was investigated by the FBI as part of a sting operation initially focused on others who had pledged loyalty to a now-deceased Taliban and terrorist leader. He planned to travel to Syria to engage in violent jihad and hoped to take his wife and two children. While he never expressed a desire to harm Americans, he did attempt to board a

plane as the first step in his goal of joining ISIS. As part of a plea agreement, the government asked the court to impose a sentence of 84 months, far less than the statutory maximum of 180 months. The judge sentenced Wolfe to 82 months' imprisonment plus 5 years' supervised release.

*Aaron Daniels*

In *United States v. Daniels*, No. 2-16-cr-00222 (D. Ohio), Daniels was initially indicted of two counts of providing and attempting to provide himself as personnel to ISIS in violation of § 2339B. He was arrested at the airport before boarding his outbound flight and later admitted to the FBI that his ultimate destination was Libya, where he intended to join ISIS. He further confessed to previously sending $250 via Western Union to an ISIS member and recruiter. Pursuant to a plea agreement, he pleaded guilty to one count under § 2339B. The government urged the court to impose a 17-year term of imprisonment, or at a minimum a 15 years, because of Daniels' "ability to manipulate others and his commitment to one of the most pernicious terrorist organizations in modern history." Gov't Sentencing Mem. at 14, ECF No. 87. The judge sentenced him to 80 months' imprisonment with lifetime supervised release.

I find that Muhtorov falls in the middle of this group of cases. He is unlike many of the defendants in that he is not young, did not plead guilty, and did not provide assistance to the government. However, that he refused to plead guilty does not set his case so apart from the others that they are incomparable, and I will not impose a trial tax that effectively penalizes him for exercising his constitutional right to a jury trial. Furthermore, there was no evidence of an ongoing conspiracy in the United States that extended beyond himself and Jumaev for which he could have provided information.

Muhtorov's involvement with the IJU is markedly different from the ISIS recruitment epidemic that seeks to radicalize potential fighters to inflict violence on innocent civilians on U.S. soil and overseas. He has never committed himself to or attempted to aid in the violent activities of a "pernicious" group like ISIS. Indeed, he continues to assert that he "never intended on helping" anyone, including himself, "follow[ ] through on any of [the] talk" in which he engaged. *See* Supplement to Muhtorov's Mot. for Variant Sentence and Downward Departure at 2, ECF No. 1956-1. It was routine for him to change his mind, his plans, and his story. This does not diminish the gravity of his actions, of course, but it does help distinguish him from those defendants who are extremely unlikely to ever be deradicalized or rehabilitated.

IV.

SENTENCE

Muhtorov's Motion for a Variant Sentence (ECF No. 1955)[22] is GRANTED in that I impose the following sentence outside the advisory Guidelines range and pursuant to the § 3553 factors explored in full above.

I sentence Jamshid Muhtorov to 96 months' imprisonment on Count 1, 96 months' imprisonment on Count 2, and 132 months' imprisonment on Count 3, the sentences for each count to run concurrently. I recommend to the Bureau of Prisons that Muhtorov be placed at an appropriate facility here in Colorado so that he may remain close to his family. Muhtorov shall be placed on supervised release for a term of 15 years for each count, also to run concurrently. He shall immediately pay a special assessment of $300. Because he does not have the ability, prospects, or resources to pay a fine, I waive the fine.

---

[22]Although, in calculating the appropriate Guidelines range, I found it was appropriate to depart under U.S.S.G. § 4A1.3, Muhtorov's Motion for a Downward Departure (also set forth in ECF No. 1955) is DENIED, as I am not sentencing him in accordance with the Guidelines.

Within 72 hours of release from the custody of the Bureau of Prisons, Muhtorov shall report to the Probation Office in the District of Colorado. While on supervision, he is subject to the following conditions which may not be changed or modified without prior authorization of this Court:

1.      He must not commit any other federal, state, or local crime.

2.      He must not unlawfully possess a controlled substance and must refrain from any unlawful use of a controlled substance.

3.      He must cooperate in the collection of DNA as directed by the probation officer.

4.      After initially reporting to the probation office, he will receive instructions from the Court or the probation officer about how and when he must report to the probation officer, and he must report as instructed.

5.      He must not knowingly leave the federal judicial district where he is authorized to reside without first getting permission from the Court or the probation officer.

6.      He must answer truthfully the questions asked by his probation officer.

7.      He must live at a place approved by the probation officer. If he plans to change where he lives or anything about his living arrangements (such as the people he lives with), he must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, he must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8.      He must allow the probation officer to visit him at any time at his home or elsewhere and must permit the probation officer to take any items that he or she observes in plain view that are prohibited by the conditions of his supervision.

9.      He must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses him from doing so. If he does not have full-time employment, he must try to find full-time employment, unless the probation officer excuses him from doing so. If he plans to change where he works or anything about his work (such as his position or job responsibilities), he must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, he must notify the probation officer within 72 hours of becoming aware of a change or expected change.

10.      He must not communicate or interact with someone he knows is engaged in criminal activity. If he knows someone has been convicted of a felony, he must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

11.     If he is arrested or questioned by a law enforcement officer, he must notify the probation officer within 72 hours.

12.     He must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person).

13.     He must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the written permission of this Court.

14.     If the probation officer determines that he poses a risk to another person (including an organization), the probation officer may require him to notify the person about the risk and he must comply with that instruction. The probation officer may contact the person and confirm that he has notified the person about the risk.

15.     He must follow the instructions of the probation officer related to the conditions of supervision.

I find that the Special Conditions of Supervision listed below are reasonably related to the

factors enumerated in 18 U.S.C § 3553(a) and 18 U.S.C. § 3583(d) and do not constitute a

greater deprivation of liberty than reasonably necessary to accomplish the goals of sentencing.

Thus, Muhtorov is subject to them as well while on supervision.

1.     If he is deported, he must not thereafter re-enter the United States illegally. If he re-enters the United States legally, he must report to the nearest U.S. Probation Office within 72 hours of his return.

2.     He may not under any circumstance use, own, or operate any computer or similar device without written authorization by the probation officer, and he must allow the probation officer to install software/hardware designed to monitor computer activities on any computer he is authorized by the probation officer to use. The software may record any and all activity on the computer, including the capture of keystrokes, application information, internet use history, email correspondence, and chat conversations. A notice will be placed on the computer at the time of installation to warn others of the existence of the monitoring software on the computer. He must not attempt to remove, tamper with, reverse engineer, or in any way circumvent the software/hardware.

3.     He must submit his person, property, house, residence, office, vehicle, papers, computers (as defined in 18 U.S.C. § 1030(e)(1)), or other electronic communications, data storage devices, or media to a search conducted by a United States probation officer. Failure to submit to a search may be grounds for revocation of release. He must warn any other occupants that the premises may be subject to searches pursuant to this condition. An officer may conduct a search pursuant to this condition only when reasonable suspicion exists that he has violated a condition of his

supervision and that the areas to be searched contain evidence of this violation. Any search must be conducted at a reasonable time and in a reasonable manner.

4.      He shall not possess, view, access, or otherwise use material that reflects extremist or terroristic views or is deemed to be similarly inappropriate by the U.S. Probation Office.


        DATED this 30th day of August, 2018.


                                                        _____
                                                        JOHN L. KANE
                                                        SENIOR U.S. DISTRICT JUDGE